UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANICE KEEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 9964 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| TEVA SALES AND MARKETING, INC., | ) | |
| and TEVA PHARMAECUETICALS USA, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Janice Keen ("Plaintiff") brings this 37-count employment discrimination lawsuit alleging that Teva Sales and Marketing, Inc. and Teva Pharmaceuticals USA, Inc. (collectively, "Teva" or "Defendants") discriminated and retaliated against her because of her disability and gender in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Illinois Human Rights Act ("IHRA"), 775 ILL. COMP. STAT. 5/1-101 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (16-cv-9964, R. 26, Am. Compl. at 1-172.[1]) Plaintiff also brings claims under the Illinois Whistleblower Act ("IWA"), 740 ILL. COMP. STAT. 174/1 *et seq.*, and a claim for retaliatory discharge under Illinois law. (*Id.*) Defendants move for summary judgment on all of Plaintiff's claims.[2] (14-cv-9626, R. 81, Mot. for Summ. J. at 1; 16-cv-9964, R. 30, Suppl. Mot. for Summ. J. at 3.) Plaintiff opposes the motion, and moves to strike Defendants' reply brief and sanction Defendants for raising

---

[1] The Court cites to the amended complaint's page numbers instead of its numbered paragraphs because it has paragraphs with the same number, making it difficult to differentiate one paragraph from another.

[2] Both parties incorporate their summary judgment filings from a related case, case number 14-cv-9626, which was consolidated with this case, case number 16-cv-9964. (16-cv-9964, R. 30-1, Mem. at 1 n.1; *id.*, R. 38, Resp. at 1.)

arguments in their reply that were not raised in their motion for summary judgment. (*Id.*, R. 47, Mot. to Strike.) For the reasons set forth below, Defendants' motion for summary judgment is granted, and Plaintiff's motion to strike and for sanctions is denied.

## RELEVANT FACTS[3]

This suit implicates facts and numerous discrete incidents that occurred over several years during Plaintiff's employment. The Court, therefore, only summarizes those facts that are material to Plaintiff's claims. The following facts are undisputed unless otherwise stated.

### I.    The Parties and Plaintiff's Supervisors

Defendants are Delaware corporations and pharmaceutical companies. (14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' Statement of Material Facts [hereinafter "SOMF"] ¶ 1; 16-cv-9964, R. 28, Answer to Am. Compl. at 2.) In June 2005, Keen was hired as a sales specialist by Cephalon, a pharmaceutical company later acquired by Teva. (14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 3.) As a sales specialist, she was responsible for selling pharmaceuticals in the Chicago area. (*Id.*) The physical requirements of her job included daily driving, getting in and out of her car, carrying promotional materials, climbing and descending stairs, and walking to and from physicians' offices. (16-cv-9964, R. 28, Answer to Am. Compl. at 3.)

Prior to Teva's acquisition of Cephalon in October 2011, Plaintiff reported to Katherine Stanek. (14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 3.) Shortly after the acquisition, Plaintiff began reporting to Scott Bischoff, Teva's Chicago regional sales manager. (*Id.* ¶ 4.) Sometime in 2013, Mike Rothweiler replaced Bischoff as the regional sales manager, and Plaintiff then began reporting to him. (*Id.*) Stanek, Bischoff, and Rothweiler all reported to

---

[3] The parties struggled to adhere to Local Rule 56.1's requirement that their statements of fact consist of "short numbered paragraphs," but in the interest of justice, the Court will not strike their statements of fact. N.D. ILL. L.R. 56.1; *see also Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("[I]t is clear that the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion." (citation omitted)).

Matthew Muller, who was a director of sales at Cephalon and later the director of sales for Teva's "central nervous division" following Teva's acquisition of Cephalon. (*Id.* ¶ 5.)

## II.  Plaintiff's Leaves of Absence in 2010-2012

In November 2010, Plaintiff was involved in an automobile accident while she was working and injured her neck and shoulder as a result. (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 34, 37.) After the accident, she took a leave of absence for approximately five months and returned to work either "at the end of April or early May" in 2011. (*Id.* at 40-41.) Shortly after the accident, Plaintiff filed a claim with the Illinois Workers' Compensation Commission ("IWCC") related to the accident. (16-cv-9964, R. 41-2 at 86, Workers' Comp. Claims.) In November 2011, Plaintiff underwent surgery to repair a torn rotator cuff, and she took a one month leave of absence following her surgery. (14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 11.)

The following year, Plaintiff underwent spinal surgery to repair injuries she suffered in the November 2010 car accident and took another leave of absence. (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 51-53.) Her leave began in June 2012 and lasted for twelve weeks, at which time Plaintiff exhausted her leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. (*Id.* at 52-53.) Just a few months after she returned, Plaintiff discovered that her spinal surgery had failed and that she would need another surgery. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 16.) On December 12, 2012, Plaintiff met with Teva's director of human resources, Rob Bobrowski, and explained to him that "she was going to be off work for an extended period of time because of her disability of degenerative cervical disc disease" and surgery she had scheduled. (*Id.*, R. 89, Defs.' Resp. to Pl.'s Statement of Additional Material Facts [hereinafter "SOAMF"] ¶ 22.) Later in December 2012, Plaintiff underwent a second spinal surgery which led to an extended leave of absence from Teva. (*Id.* ¶¶ 5, 11, 22.)

## III. Plaintiff's Leave and Return to Work in 2013[4]

While Plaintiff was still on leave, Plaintiff's physician, Dr. Gary Shapiro, wrote a letter to

Defendants on May 8, 2013, informing them that Plaintiff was scheduled for another spinal

surgery on May 17, 2013, and that she was to refrain from work until the surgery. (*Id.*, R. 81-12

at 16, May 8, 2013, Shapiro Letter.) Dr. Shapiro also informed Defendants that Plaintiff would

need two to six weeks to recover. (*Id.*) Plaintiff's surgery, however, was cancelled. (*Id.*, R. 89,

Defs.' Resp. to Pl.'s SOAMF ¶ 9.) Soon after, on May 23, 2013, Bobrowski wrote a letter to

Plaintiff, which stated:

> As you know, you have been out of the workplace and field since December 21, 2012. In addition, this time has not been approved under Teva's Family Medical Leave Policy and Teva's Short Term/ Long Term disability plans. Thus, your time is currently categorized as personal, unpaid, non-FML leave. Also, since that time, Teva has provided you with full benefits and use of a company car.

> For approximately five (5) months, the Company has accommodated your requested leave and kept your position vacant pending your return. We ask that you notify us no later than May 31, 2013 as to your work status. Please have your physician review your job description and complete the Physical Capabilities Checklist (attached), confirming if you are fit for duty and identifying any restrictions or accommodations necessary and, indicating if/when you will be able to return to work. . . .

> If you are unable to return to work on or around June 3, 2013, and perform the essential function of your job, with or without accommodation, you will be administratively laid off from your employment. However, if you are laid off, you are invited to contact us when you are able to return to work to discuss any available positions for which you may be qualified[.]

(*Id.*, R. 81-12 at 18, May 23, 2013, Bobrowski Letter.)

---

[4] The parties dispute who is to blame for the length of Plaintiff's absences, so the Court focuses on the undisputed facts and construes the facts and all reasonable inferences in favor of Plaintiff—the nonmoving party. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011). "[R]easonable inferences, however, do not include every possible inference, only those supported by the record." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 716 (7th Cir. 2013). Additionally, testimony must be based on a witness' personal knowledge "grounded in observation or other first-hand personal experience," which does not include "speculations, hunches, intuitions, or rumors[.]" *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (citation omitted); *see also Pryor v. City of Chicago*, 726 F. Supp. 2d 939, 943 (N.D. Ill. 2010) (refusing to consider on summary judgment assertions not based on witness' personal knowledge).

In response, on May 29, 2013, Plaintiff faxed a letter to Teva's nurse care manager, Donna Montagna, representing that her physician had released her to return to work on June 3, 2013. (*Id.*, R. 81-12 at 20, May 29, 2013, Keen Letter.) Attached to the fax was the Physical Capabilities Checklist (the "Checklist") that Teva had enclosed with Bobrowski's May 23 letter, which was completed and signed by Dr. Shapiro. (*Id.*) The Checklist detailed Plaintiff's physical capabilities and limitations, indicating that she could: (1) lift, carry, push, and pull up to 10 pounds; (2) sit continuously; (3) stand, walk, and drive frequently; and (4) bend, squat, reach above her shoulder, and kneel occasionally. (*Id.*)

Despite Plaintiff's letter enclosing the Checklist, Montagna instructed Plaintiff to not return to work on June 3, 2013. (*Id.*, R. 89, Defs.' Resp. to Pl.'s SOAMF ¶ 10.) Montagna told Plaintiff that she was not cleared to return to work because "someone in HR thinks you need surgery." (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 74.) Specifically, Plaintiff understood that someone in Teva's human resources department told Montagna that Plaintiff could not return to work until she underwent the surgery that was previously scheduled for May 17, 2013, but had been cancelled. (*Id.* at 74-76.) Shortly thereafter, on June 5, Plaintiff called Defendants' compliance hotline and claimed that Defendants discriminated against her on the basis of her disability. (16-cv-9964, R. 28, Answer to Am. Compl. at 5.)

Defendants denied Plaintiff's return in early June because they had reviewed the Checklist and concluded that there was a lack of clarity and agreement as to Plaintiff's work-related restrictions and necessary accommodations. (14-cv-9626, R. 86-8, Bobrowski Oct. 19 Dep. Tr. at 103-09.) Plaintiff's surgery that was originally scheduled for May 17, 2013, but later cancelled, eventually took place in July 2013. (*Id.*, R. 89, Defs.' Resp. to Pl.'s SOAMF ¶ 10.) Following the surgery, on August 22, 2013, Plaintiff faxed another Checklist to Teva. (*See id.*,

R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 23.) Teva advised her that, because she had been absent from work for over six months, she needed to complete a "return-to-work" examination. (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 78.)

On August 27, 2013, Plaintiff completed that examination. (*Id.* at 78-79, 85.) Following this examination, Montagna called Plaintiff and told her that there was "a problem" with the results and therefore she requested that Plaintiff undergo a second examination. (*Id.* at 86-87.) Specifically, Plaintiff was informed that she had to undergo a second test because the first test found that her neck was normal, but Defendants believed that the test failed to indicate that she had a "scar or something to that effect" on her neck. (*Id.*) In response, Plaintiff refused to complete a second examination and, shortly thereafter, Plaintiff's then-counsel requested information from Teva as to why a second examination was necessary. (*Id.* at 86-88.) Even though Plaintiff did not retake the examination, on September 11, 2013, Montagna called Plaintiff and informed her that she could return to work the following day. (*Id.* at 88.) Plaintiff returned to work on September 12, 2013, and her only work restriction was that she could not lift more than twenty pounds. (*Id.*, R. 89, Defs.' Resp. to Pl.'s SOAMF ¶ 11; *id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 80.)

## IV.    Plaintiff's Request to Attend a Training Workshop

In early 2014, Plaintiff signed up for a training workshop in Pennsylvania scheduled for February 2014. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 55-56.) Plaintiff, however, was not approved to attend this workshop because Defendants wanted their sales representatives to focus on having a strong start to their year, and Defendants recommended that Plaintiff wait until later in the year to attend a workshop. (*Id.* at 56-57.) Another woman on Plaintiff's team, Jonnie Blake, was not approved to go to the workshop either, but Plaintiff knew of three men who were

approved. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 57-58.) The same number of men and women from Teva, however, attended the Pennsylvania workshop. (*Id.*, R. 81-6, Bobrowski Aff. ¶ 8.)

## V.    The Senior Executive Sales Specialist Position

While Plaintiff was on leave in 2013 she was notified that her job title had changed from "Territory Sales Specialist" to "Executive Sales Specialist." (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 89-90.) While at Cephalon, Plaintiff's job title was Territory Sales Specialist, and all sales representatives at Cephalon had that same title. (*Id.* at 89.) After Teva acquired Cephalon, Teva undertook a project to rename Cephalon's job titles to those more consistent with job titles used at Teva. (*Id.*, R. 86-9, Bobrowski Jan. 28 Dep. Tr. at 14-15.) This process involved a review of each sales representative's experience and performance over time to decide how each sales representative's job title would be renamed. (*Id.* at 14-20.) Plaintiff believes that although she met the qualifications for a "Senior Executive Sales Specialist" ("SESS"), she was instead designated as an Executive Sales Specialist. (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 90-91.)

As part of its process to re-categorize each sales representative, Teva established a committee (the "Committee") that included, among other directors of Teva's sales divisions, Muller, director of the sales division for which plaintiff worked. (*Id.*, R. 86-10, Muller Dep. Tr. at 58.) Sales directors, like Muller, would have a discussion with lower-level managers to determine the recommended job title for each employee within that sales director's division. (*Id.* at 58-59.) Sales directors would then present those recommendations to the Committee for its review. (*Id.* at 59.) The Committee then considered each employee's sales performance and other factors, and attempted to evaluate each employee in a uniform manner. (*Id.* at 60-63.) Afterwards, Teva's sales directors voted to approve each employee's job title. (*Id.* at 61.)

Within Muller's division, Muller reviewed an evaluation generated by each employee's immediate supervisor that described the employee's characteristics outside of his or her sales performance, such as the employee's leadership and mentorship qualities. (*Id.* at 64.) In Plaintiff's case, her direct supervisor, Bischoff, completed her evaluation that Muller reviewed in order to determine—together with the other sales directors—her job title. (*Id.* at 64-65.)

The Committee could assign one of five positions to each sales representative: (1) Sales Specialist, (2) Professional Sales Specialist, (3) Senior Sales Specialist, (4) Executive Sales Specialist, and (5) SESS. (*Id.*, R. 81-12 at 11-14, Promotional Guidelines.) The qualifications for SESS were:

1.  a rating of "meets" or better for two of the last three years, which is a rating indicating that the employee met his or her responsibilities in a given year;

2.  a rating of "exceeds" or better for at least one of the last two years, which is a rating indicating that the employee "exceeded" his or her responsibilities in a given year;

3.  finishing within the top 30% of Teva's sales representatives in one of the last three years and within the top 50% of Teva's sales representatives in the other two years;

4.  working a minimum of three years as a Teva Executive Sales Specialist;

5.  more than eleven years[5] of experience working in pharmaceutical sales; and

6.  being a "leader," "mentor," and "role model."

(*Id.*, R. 81-12 at 11-14, Promotional Guidelines.)

---

[5] The underlying evidence indicates that an employee needed only ten years of experience in pharmaceutical sales for the SESS position. (14-cv-9626, R. 81-12 at 11-14, Promotional Guidelines.) The exact number, however, is immaterial as the parties do not dispute that Plaintiff satisfied this requirement. (*Id.*, R. 81-2, Defs.' SOMF ¶ 29.)

Plaintiff met the objective qualifications for the SESS position such as sales numbers and years of experience. (*See id.*; *see also id.*, R. 86-1, Pl.'s SOAMF ¶ 29.) Additionally, Teva's internal evaluation of Plaintiff as part of the Committee's review process shows that she was recommended for the SESS position. (*Id.*, R. 81-10 at 20, Eligibility Criteria Worksheet; *see also id.*, R. 81-10, Muller Dep. Tr. at 53-54.) Despite this recommendation, Plaintiff was ultimately designated as an Executive Sales Specialist. (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 90-91.)

Multiple Teva employees testified that Plaintiff did not receive the SESS position because she was not considered a role model or leader. For example, Plaintiff's supervisor prior to 2011, Stanek, testified that Plaintiff "always did well on the sales performance," but it was "well-documented" that "she was not executing against behaviors that the company held as standards." (*Id.*, R. 86-16, Stanek Dep. Tr. at 29-30.) During the employee reclassification process, Muller asked Bischoff about examples of Plaintiff being a leader, mentor, or role model, and Bischoff "did not have any examples to speak to." (*Id.*, R. 86-12, Bischoff Dep. Tr. at 23.) Instead, Bischoff spoke to Plaintiff's "lack of leadership, her lack of mentorship, her lack of initiative, her lack of role modeling, lack of collaboration, and her lack of followership." (*Id.*) Bischoff also gave Muller examples to support his observations about Plaintiff. (*Id.* at 23-24.)

While largely positive, some of Plaintiff's written reviews included similar criticisms. Plaintiff's 2010 Cephalon review lauded her for her sales numbers, clinical and product knowledge, customer knowledge, and stated that Plaintiff's "leadership and ability to adapt to a changed environment is appreciated by her manager." (*Id.*, R. 86-16 at 53-56, 2010 Performance Summ.) The review, however, also stated that Plaintiff did not meet expectations regarding targeting customers with the greatest sales potential and that her "failure to show improvement

planning and organizing over the past 9 month[s] speaks to an unwillingness to adopt and implement change when she does not agree with corporate goals and strategies." (*Id.* at 55.)

Plaintiff's 2011 Abbreviated Performance Summary was almost entirely positive, noting that she was on pace to exceed her sales quota, she had earned a "President's Club rank," and her knowledge of the product was "superior." (*Id.*, R. 86-16 at 57-58, Abbreviated Performance Summ.) The review did note that she was on a medical leave for some of 2011, but "[w]hile in territory she did not meet expressed call expectations." (*Id.*) Specifically, it stated that Plaintiff "was consistently behind the Nation, Region and team call averages throughout each evaluation period." (*Id.*) Despite this critique, the summary concluded that Plaintiff was "consistently a top performer[] in the organization[.]" (*Id.*)

On October 31, 2013, Plaintiff met with Muller and Rothweiler to discuss her 2012 performance review and the reasons why she was not selected for the SESS position. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 35.) The results of Plaintiff's 2012 Mid-Year Performance Review—which was completed by Rothweiler's predecessor, Bischoff—were distinctly lower than prior years. (*Id.*, R. 81-7 at 60-65, 2012 Mid-Year Performance Review.) The review had performance categories of: "Below," "Mostly Meets," "Meets," "Exceeds," and "Exceptional." (*Id.*) Plaintiff did not receive any "Exceeds" or "Exceptional" in any individual category and her overall evaluation was "Mostly Meets." (*Id.* at 60-64.) In a section assessing Plaintiff's "Strengths and Needs," Bischoff did not list any "Strengths." (*Id.* at 64.) As to Plaintiff's "Needs," Bischoff wrote that Plaintiff: "needs to improve her time and territory management" because "her calls per day are among the lowest in the area;" "should increase her overall activity in line with area and regional averages;" "should be more proactive in completing

administrative requirements" including "expense reports;" and "could benefit from increased resource utilization." (*Id.*)

At the meeting with Muller and Rothweiler on October 31, 2013, Muller informed Plaintiff that although she met all of the objective criteria to qualify for the SESS position, she was not sufficiently a leader, mentor, or role model to merit the SESS position. (*Id.* at 109; *id.*, R. 86-10, Muller Dep. Tr. at 109-10.) To refute this, Plaintiff points out that in September 2011, Stanek emailed Muller, Reilly, and Plaintiff comparing her to Lou Holtz, a former coach of the University of Notre Dame's football team, and wrote: "Over the past several years you've been our Lou Holt[z], an inspiration to so many at Cephalon including myself, and we are so proud of you! Like him, you are in a league of your own!" (*Id.*, R. 86-16 at 59-62, Stanek Sept. 9, 2011, Email.)

Plaintiff asserts that the actual reason behind Teva's decision not to promote her to the SESS position was because of her disability and gender. To support these allegations, Plaintiff points to a number of facts. Plaintiff testified that Muller told her that she had not actively participated in meetings and that she had missed meetings. (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 109, 115.) Plaintiff also notes that on November 14, 2012, she emailed Bischoff about her performance reviews, stating that her "challenge" at work "is obvious with [her] medical leave and . . . need for accommodations[.]" (*Id.*, R. 86-12 at 16, Bischoff Nov. 14, 2012, Email.) In response, Bischoff wrote:

> Your medical limitations and leave of absence have had a significant impact on your ability to perform this year at a high level but that shouldn't detract you from returning to President's club in 2013! I think next year you will be in a much better position to succeed while documenting competencies along the way. I am confident you will return to a top performing sales executive.

(*Id.*)

Plaintiff also claims that there were "many men, with no disability, without the qualifications" that were promoted to the SESS position. (*Id.*, R. 89, Defs.' Resp. to Pl.'s SOAMF at 10.) In support, Plaintiff identifies six men who "did not have all [of] the required qualifications . . . but were nonetheless promoted to the position, without any interview." (*Id.* ¶ 24.) No individual directly reporting to Bischoff, however, "was qualified for the SESS position." (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 34.)

## VI. Plaintiff's 2013 Bonus and Salary

Plaintiff's 2013 bonus payments were approximately $12,000 less than what she was expecting. (*Id.*, R. 86-7, Keen May 24 Aff. ¶¶ 7-9.) Plaintiff asked Rothweiler why her bonus had been reduced in 2013, and Rothweiler told her that the bonus was reduced because she was out of her territory for most of the year. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 10-11.) Plaintiff, however, also testified that her bonus was reduced because Teva prohibited her from returning to work in June 2013 and did not allow her to return until September 2013. (*Id.* at 11.)

Bonuses at Teva are calculated "based on performance measured by sales of the representative's territory" and are paid every three months. (*Id.*, R. 89, Defs.' Resp. to Pl.'s SOAMF ¶ 29.) Teva's 2013 Annual Incentive Plan states in relevant part, "[l]eaves of absence will impact incentive eligibility in proportion to the length of the leave, with the exception of an approved leave that qualifies under FMLA, the Parental Leave Policy and/or the Military Leave Policy." (*Id.*, R. 81-6 at 10, Annual Incentive Plan.)

## VII. Plaintiff's Leave in 2014 and Performance Following Her Return to Work

In January 2014, Plaintiff reinjured her shoulder while attempting to refill her car's windshield wiper fluid. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 12-17.) Following her injury, Plaintiff continued to work from January 29, 2014, until March 12, 2014. (*Id.*, R. 86-1, Pl.'s

Resp. to Defs.' SOMF ¶ 44.) Plaintiff filed a workers' compensation claim with the IWCC for this injury. (16-cv-9964, R. 41-2 at 85, Workers' Comp. Claims.) Plaintiff did not go on medical leave immediately following the injury because she "had not yet qualified for family medical leave," and "needed job-protected leave[.]" (14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 44.) Plaintiff eventually went on FMLA leave, and while on leave, Plaintiff had another surgery on her spine in March 2014 and a surgery to repair her rotator cuff on May 15, 2014. (*Id.* ¶¶ 45-46.) On June 2, 2014—the day before Plaintiff's FMLA leave was set to expire—Plaintiff sent an email requesting two additional months of leave as an ADA accommodation. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 23-27.) Defendants agreed to the extension, and Plaintiff returned to work on August 7, 2014. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶¶ 46-47; *see also id.*, R. 81-11 at 54, Bobrowski June 10, 2014, Letter.) Teva's letter extending Plaintiff's leave, however, stated that her territory was "not being managed by an active sales representative" because of Plaintiff's "extended absences," and also stated that "any requests for additional extended leaves will be closely scrutinized as Teva must have an active representative within [Plaintiff's] territory[.]" (*Id.*, R. 81-11 at 54, Bobrowski June 10, 2014, Letter.)

Upon Plaintiff's return to work in August 2014, Rothweiler remained Plaintiff's supervisor, (*id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 23), and the two met to discuss her performance expectations for the rest of the year, (*id.*, R. 81-14, Rothweiler Aff. ¶ 2). As part of these expectations, Plaintiff was provided a "call list," which "assigned a certain number of [sales] calls over the course of the year[.]" (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 48.) Included in this call list were physicians in Plaintiff's Indiana territory that were identified as "high decile prescribers," or those doctors that could be encouraged to prescribe more Teva products. (*Id.*) Plaintiff claims that the list that Rothweiler created for her was misguided because many of the

targets were "retired" or not in her territory, and the suggested call volume did not account for the time she was on medical leave. (*Id.* at 49; *see also id.*, R. 86-7, Keen May 24 Aff. ¶ 31.) Following the meeting, Plaintiff also "repeatedly complained to . . . Rothweiler regarding unusual challenges related to [her] leave that affected [her] ability to do [her] job," such as the "inability to access corporate websites," "inconsistencies with data," "problems accessing a case manager," issues with her medical care, and "issues concerning [her] corporate" credit card. (*Id.*, R. 86-7, Keen May 24 Aff. ¶ 30.)

In November 2014, Rothweiler accompanied Plaintiff on a two-day field visit. (*Id.*, R. 81-14, Rothweiler Aff. ¶¶ 3-4.) Per Teva's practices, Rothweiler prepared a field coaching report ("FCR") following the field visit. (*Id.* ¶ 4.) The FCR provided both positive and negative comments regarding Plaintiff's "business acumen." (*Id.*, R. 81-14 at 6, FCR.) For example, the review stated that Plaintiff engaged in "good discussion" with physicians and "did a nice job of gaining commitment with . . . physicians to prescribe our products." (*Id.* at 8.) The FCR, however, discussed the fact that Plaintiff did not make sales calls to Indiana, stating that "[o]verall 30% of [Plaintiff's] business comes from Indiana, however only 2% of [her] time has been spent there." (*Id.* at 6.) The FCR also concluded that Plaintiff did not exercise a "sound strategy" for sales, and was making very few sales calls in the morning hours. (*Id.* at 6, 10.)

Plaintiff's morning absences were due to physical therapy appointments she attended once or twice a week, regular doctor's appointments, and a daily "morning exercise program." (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶¶ 50-51.) These obligations caused Plaintiff to delay the start of her work day or caused her to miss one to two mornings of work every week. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 34, 37.) She testified, however, that Rothweiler approved these accommodations. (*Id.*)

## VIII. The 2014 "Make It Happen" Sales Contest

While Plaintiff was on leave in 2014, a sales contest took place at Teva that it branded as the "Make It Happen" sales contest. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 73.) Initially, Plaintiff was listed as not being eligible to participate in the contest. (*Id.*) Jeffery Schurr, a senior manager of incentive compensation at Teva, categorized Plaintiff as ineligible because he was informed by Bobrowski that Plaintiff was "on a leave that was bonus ineligible." (*Id.*, R. 86-15, Schurr Dep. Tr. at 18.) On June 25, 2014, after seeing an email listing her as ineligible to participate, Plaintiff emailed Rothweiler to explain that she was in fact eligible to participate in the contest. (*Id.*, R. 81-11 at 70, Keen June 25, 2014, Email.) Five days later, on June 30, 2014, Rothweiler notified Plaintiff that she was eligible to participate in the contest and would be receiving credit for it. (*Id.*, R. 81-11 at 70, Rothweiler June 30, 2014, Email.)

Plaintiff testified that in the days following the error and before Teva corrected the error, she suffered "great humiliation and embarrassment from the incorrect results from the contest and received calls from many colleagues asking what was wrong with her or if she was on a performance improvement plan." (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 72-76, 82-83.) Even though Plaintiff was informed that she was in fact eligible to participate in the contest, Teva did not correct the "humiliating e-mail that was sent out by the vice president" announcing that Plaintiff was ineligible. (*Id.* at 73.) Plaintiff, however, did participate in the contest and was paid as one of the winners of the contest. (*Id.* at 76.)

## IX. Plaintiff's Request for a Sales Territory Accommodation

After her return in August 2014, Plaintiff made repeated requests to her supervisors and Teva's human resources department to modify her sales territory. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 55.) In November 2014, Plaintiff requested that Defendants accommodate her

medical condition by removing Indiana from her territory. (*Id.* ¶¶ 54-55; *see also id.*, R. 81-11 at 73-74, Keen Nov. 20, 2014, Email.) In response, Rothweiler asked if she made a "reasonable accommodations request to anyone in the organization" and, if not, Rothweiler encouraged her to do so. (*Id.*, R. 81-11 at 73-74, Keen Nov. 20, 2014, Email.) Plaintiff replied that before she made a reasonable accommodations request, she wanted to specifically know if "sales management would consider such a request," because it would be pointless to request an accommodation if her superiors would not approve it. (*Id.*)

In December 2014 and January 2015, Plaintiff renewed her territory modification request. (*Id.*, R. 81-9 at 10-11, Keen Dec. 15, 2014, Email; *see also id.* at 13-14, Keen Jan. 16, 2015, Email.) Plaintiff's request was being considered during this timeframe, and both the sales operations and human resources departments were involved in reviewing Plaintiff's request. (*Id.*, R. 81-9, Rothweiler Dep. Tr. at 25-26; *see also id.*, R. 81-9 at 13-14, Keen Jan. 16, 2015, Email.)

Plaintiff was instructed to speak with Elaine McGee regarding her territory modification request who, in turn, directed Plaintiff to contact Work Care, an occupational health management company that Teva contracted with to handle "return to work and/or reasonable accommodation issues for Teva employees." (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 135-36.) Plaintiff had prior confrontational experiences with a Work Care account manager, and Dr. Peter Greaney, Work Care's founder and chief executive officer, was advised that Plaintiff was "quite argumentative" and "had initially refused to sign" Work Care's standard Health Insurance Portability and Accountability Act ("HIPAA") release form. (*Id.*, R. 81-15, Greaney Aff. ¶¶ 1, 4.) Specifically, Plaintiff: had "blacked out" portions of Work Care's standard HIPAA form that it used to obtain an employee's medical information; was not willing to release medical information; and took issue with the fact that Work Care would need to talk to her health care providers. (*Id.* ¶ 4.) The

"matter was escalated" to Dr. Greaney, who called Plaintiff in April 2015 to seek more clarity on her requests for accommodations. (*Id.* ¶ 5.) Plaintiff was "rude, loud, and argumentative during the course of the call," and also told him "that a clinical clarification was not required." (*Id.*; *see also id.* at 5, April 3, 2015, Email; *id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 59.) After repeated warnings, Dr. Greaney "reluctantly terminated the call." (*Id.*, R. 81-15, Greaney Aff. ¶ 5.) Plaintiff testified that after Dr. Greaney "hung up" on her, she felt "helpless" and humiliated. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 187-88.) Despite this exchange with Dr. Greaney, Plaintiff provided Work Care with her recent surgical reports and documents that she believed demonstrated her need for a reasonable accommodation. (*See id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 136-138.) There is no indication, however, that these reports made any reference to the fact that her territory needed to be realigned to accommodate her medical needs. (*See id.*)

While Plaintiff had conversations with at least two of her doctors regarding changing her sales territory to accommodate her medical condition, (*id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 129, 132), there is no evidence that any of Plaintiff's doctors, as opposed to Plaintiff herself, directly communicated with anyone at Teva or Work Care regarding this accommodation. (*See id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 57 (failing to dispute Defendants' assertion that no doctor specifically restricted Plaintiff); *id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 133-34 ("Q. What did Dr. Javed say about driving in Indiana? . . . A. He supported my efforts to continue pursuing that accommodation. Q. And did he do that in writing? A. No. I didn't ask him to.").) Ultimately, Teva denied Plaintiff's request for a sales territory modification. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 57.) Notably, Dr. Greaney stated that he did not deny her request for an accommodation, and instead "requested information necessary for clinical clarification which [Plaintiff] refused to provide." (*Id.*, R. 81-15, Greaney Aff. ¶ 6.)

## X.  Plaintiff's 2014 Performance Review and Subsequent Rebuttal

Plaintiff received her 2014 performance review in February 2015. (*Id.*, R. 86-1, Pl.'s

Resp. to Defs.' SOMF ¶ 63.) The ratings categories were "Below," "Mostly Meets," "Meets,"

"Exceeds," and "Exceptional." (*Id.*) Plaintiff's overall evaluation was "Mostly Meets," and her

overall sales ranking was 233 out of 254. (*Id.*, R. 81-11 at 76-79, Performance Mgmt. Full

Report.) Her manager's comments in the report, who was Rothweiler, included the following:

- "[Plaitniff] did not provide . . . any developmental goals in 2014."

- While Plaintiff requested to attend a "selling skills class" in the first quarter of 2014 and that request was denied, Plaintiff "did not request another class upon her return to the field in August."

- "[S]he will need to take a more proactive approach . . . to administrative tasks, resource utilization, and communications around business issues in her territory."

- "[Plaintiff] has not demonstrated a leadership role on the team in 2014."

- "[Plaintiff] has not been able to adequately meet an appropriate level of call activity on the customers that have the greatest impact on her business."

- "[Plaintiff] did not submit any expense reports for 2014 until December."

- Plaintiff "did not spend time in the Indiana portion of her territory . . . that accounts for approximately 30% of her Nuvigil business."

- "She did not follow her call plan to effectively reach the most valued customers[.]"

(*Id.* at 77-79.) Plaintiff disagreed with the majority of these remarks as "fundamentally flawed"

and responded with a document titled "2014 Keen Performance Review Rebuttal." (*Id.* at 80; *see

also id.*, R. 86-6 at 52-64, Keen Rebuttal.)

In her rebuttal, Plaintiff described the comments in her 2014 performance review as

"false and misleading[.]" (*Id.*, R. 86-6 at 52, Keen Rebuttal.) She blamed her negative reviews on

Teva's failure to follow company policy in their handling of her leave in 2014. (*Id.*)

The rebuttal further complained that Rothweiler mistakenly included a particular doctor in her sales quota calculations that adversely affected her sales numbers. (*Id.* at 53.) Her rebuttal also claimed that her failure to provide Rothweiler with developmental goals in 2014 was because she was on medical leave at the time these goals were developed with management. (*Id.*) Plaintiff acknowledged that she did not attend the "setting skills class" in the first quarter of 2014 because Rothweiler made her cancel her attendance at that class and told her that she could attend another class later in the year. (*Id.*) She also claims that Rothweiler did not invite her to a class later on in the year and that he was nonresponsive when she asked him for class recommendations. (*Id.* at 54.) As to her lack of collaboration with other employees, Plaintiff stated in her rebuttal that her leave from work impacted her ability to collaborate. (*Id.*)

With respect to Rothweiler's criticism of Plaintiff's approach towards administrative tasks, "resource utilization," and communicating about business issues, Plaintiff's rebuttal attributed her lackluster performance in these areas to Rothweiler's failure to respond to her concerns about: her inability to access Teva's website and computer applications; issues contacting her managers; problems accessing medical care for work-related injuries; issues related to her corporate credit card; management's expectations of Plaintiff given her medical leave; and pending requests for accommodations that might have improved Plaintiff's performance. (*Id.* at 55.) Plaintiff acknowledged in her rebuttal, however, that many of these problems were outside of Rothweiler's domain. (*Id.*)

In response to criticisms pointing out Plaintiff's failure to call doctors in her territory that provided the most sales or sales potential for Teva, Plaintiff claimed that her poor performance was due partly to her medical leave and partly to the strategy that management provided her. (*Id.* at 55-56.) Plaintiff's rebuttal also criticized negative comments related to her failure to perform

well in Indiana, claiming that "Teva refused to provide or even engage" her in discussion about modifying her territory to account for her medical condition. (*Id.* at 57.) Plaintiff concluded her rebuttal stating that Teva failed to accommodate her medical issues and resolve other non-medical problems that affected her performance in 2014. (*Id.* at 59-64.) Within this narrative, Plaintiff accused Muller of being "dismissive" of her "disability" during an in-person performance review because it "seem[ed] to [her]" that she had to endure a poor performance review from Muller in 2014 because of her request for an accommodation. (*Id.* at 62.) While the rebuttal claims that Muller "questioned any legitimate need" for a workplace accommodation given Plaintiff's "only restriction is a 20 [pound] lifting restriction," the rebuttal does not provide specific examples in which Muller directly referenced her request for an accommodation as problematic or negatively affecting her 2014 performance review. (*See id.* at 61-62.)

This narrative also accused Muller of making crude, sexual remarks on several occasions to other Teva employees. (*Id.* at 62-64.) Plaintiff's rebuttal claimed that Muller "degraded the standards of behavior" within his division, and that his behavior was related to other instances in which Teva employees had mocked the patients of doctors to whom they marketed Teva products. (*Id.* at 63-64.)

## XI.    Plaintiff's Request for Excess Insurance

In March 2015, Teva began offering certain employees excess insurance in addition to their regular auto insurance coverage. (*Id.*, R. 81-18, Rohach Aff. ¶ 2.)[6] Plaintiff called Teva's human resources department to inquire about this benefit, and she spoke with Melissa Slifer, the Teva employee responsible for such inquiries. (*Id.* ¶ 4; *id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 88.)

---

[6] Plaintiff argues that this affidavit is hearsay. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 3.) This affidavit, however, is based on personal knowledge and does not rely on out-of-court statements to prove the truth of the matter asserted. FED. R. EVID. 801(c) (" 'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers . . . to prove the truth of the matter asserted[.]").

Slifer explained to Plaintiff that she was not offered the excess insurance because that benefit was only offered to employees above a certain income level, and Plaintiff's income was not high enough to qualify. (*Id.*, R. 81-18, Rohach Aff. ¶¶ 4-5; *id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 89.)

Plaintiff believes she was denied the insurance because of her gender, disability, and previously-filed discrimination claims. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 93-94; *see also id.*, R. 89, Defs.' Resp. to Pl.'s SOAMF ¶ 38.) Plaintiff testified that during her call with Slifer, in addition to explaining the income level eligibility, Slifer said that she was not offered the umbrella policy because "[i]t was on the advice of [Defendants'] counsel[.]" (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 89.) Plaintiff believes that she was denied the benefit because of her disability and gender, and, when asked for the basis of her belief, she said "[b]ecause I should have gotten it." (*Id.*) When pushed again, Plaintiff testified, "I'm a female. I should have been offered that. I wasn't and I was given a reason that I didn't qualify for the benefit that simply was not in line[.]" (*Id.* at 93.) Plaintiff also knew other representatives "who made less money than [she] did [but received] the mailing" that offered the insurance benefit. (*Id.* at 90.)

## XII.  Plaintiff's 2015 Leave and Termination in 2016

On March 4, 2015, Plaintiff injured herself when she attempted to move boxes of Teva promotional materials that had been delivered to her home. (*Id.* R. 86-6, Keen Oct. 15 Dep. Tr. at 105-06; 16-cv-9964, R. 41-2 at 84-86, Workers' Comp. Claims.) Because Plaintiff did not know the extent of her injuries, she did not immediately inform Teva of the injury. (14-cv-9626, R. 86-6, Keen Oct. 15 Dep. Tr. at 109-10.) After she sought medical treatment, Plaintiff went on leave in April 2015. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 61.) Plaintiff last performed work for Teva in April 2015. (*Id.* ¶ 62.) On April 20, 2015, Plaintiff had another surgery to address problems with her shoulder and cervical spine. (16-cv-9964, R. 40-2, Keen March 29-30 Dep.

Tr. at 358, 369.) Plaintiff also filed a workers' compensation claim with the IWCC for this injury. (*Id.*, R. 41-2 at 84, Workers' Comp. Claims.)

Later in April 2015, Teva did not promptly provide Plaintiff with a medical case manager to address medical issues resulting from Plaintiff's surgery. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 99-100.) Plaintiff did not understand that Teva had any obligation to provide her with a case manager, but instead she believed that the appointment of a case manager was "the process [she] was supposed to go through as an employee." (*Id.* at 100.) Plaintiff spoke with Teva vice president Ken Adamson regarding her medical issues in 2015, but Adamson never promised a case manager to Plaintiff. (*Id.* at 101-02.)

In July 2015, Plaintiff's doctor drafted a letter stating that he did not think Plaintiff could be accommodated to return to work unless she would: be restricted to lifting no more than a pound with her right arm;[7] refrain from pushing, pulling, or any repetitive motion; and refrain from typing or driving for any extended period of time. (*Id.*, R. 30-8 at 24, July 9, 2015, Dr. Shi Letter; *Id.*, R. 30-8 at 25-26, July 9, 2015, Keen Letter.) As a result of this letter, Teva accommodated Plaintiff's medical condition and extended her leave of absence under the FMLA. (*Id.*, R. 30-8 at 27, Rothweiler July 16, 2015, Email.) This accommodation, however, was not satisfactory to Plaintiff who, at the time, could only lift one sixteen-ounce beverage in a weightless container; needed to refrain from typing for more than two minutes; needed to refrain from driving for more than one hour; and needed to attend physical therapy during the work week. (*Id.*, R. 30-8 at 28, Keen July 20, 2015, Letter.) Therefore, Plaintiff requested that she be granted leave from work until September 1, 2015. (*Id.*) In response, Defendants requested that Plaintiff execute an authorization for Defendants to review Plaintiff's medical records to confirm these representations and ascertain the accommodations Plaintiff required. (*Id.*, R. 30-8 at 29-30,

---

[7] Plaintiff is right-handed. (16-cv-9964, R. 30-8 at 28, Keen July 20, 2015, Letter.)

Bobrowski July 23, 2015, Letter.) Defendants also warned Plaintiff that they had "issues regarding coverage" of Plaintiff's sales "territory since at least 2011," and that they could not keep her "territory open indefinitely[.]" (*Id.*)

Plaintiff, however, refused to authorize Defendants' review of her medical records, and, having exhausted all of her FMLA leave, Plaintiff was placed on personal, unpaid leave on July 30, 2015, and given notice that she would need to return her company car. (*Id.*, R. 30-8 at 34-35, Bobrowski July 30, 2015, Letter to Keen.) Shortly thereafter, however, on August 3, 2015, Bobrowski sent a letter to Plaintiff stating that they would extend her leave of absence through September 18, 2015, pursuant to "the Americans with Disabilities Act and the Illinois Human Rights Act." (*Id.*, R. 30-9 at 42, Bobrowski Aug. 3, 2015, Letter.)

In August 2015, Teva again delivered several boxes containing promotional materials to Plaintiff, which were delivered to her front porch and partially obstructed the entrance to her home. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 81-82.) To avoid lifting the boxes, Plaintiff opened them, removed the promotional materials inside them, and placed the promotional materials in her company car that Teva later came to retrieve on August 13, 2015. (*Id.* at 83.)

Plaintiff was not compensated for her absence from work that she took in April 2015. (*Id.* at 113.) During this time, Defendants' disability benefits vendor, the Matrix Company ("Matrix"), informed Plaintiff that she would not receive disability benefits because she made a claim for a workplace injury, an injury that was excluded under her disability benefits policy. (*Id.* at 113-15.) Plaintiff believed that her failure to receive disability benefits was retaliatory because she was not paid on her workers' compensation claim, and she believed Teva's policy required her to be paid either the disability benefits or workers' compensation. (*Id.* at 116-17.) Plaintiff's workers' compensation claim, however, was still pending at the time of her deposition when she

testified that she had not yet received any workers' compensation benefits. (*Id.* at 121.) Matrix also informed Plaintiff that she could receive disability benefits if she entered into a "reimbursement agreement" with Teva that required her to waive certain medical and legal costs she had incurred, but Plaintiff refused to accept this agreement. (*Id.* at 123-24, 129-30.) Plaintiff believes that her failure to receive any disability benefits was due to retaliation, but she could not identify any specific individual at Teva who retaliated against her. (*Id.* at 126, 135.) Instead, she identified a "woman" working at Matrix as the person who retaliated against her, and also attributed retaliation to her human resources and sales managers because she "worked with them" and they were "involved in the decisions not to facilitate [her] claims[.]" (*Id.* at 126-28.)

Also during this timeframe, in response to Plaintiff's workers' compensation claims, Debbie Smith of Scott insurance was investigating the shipments of Teva promotional materials that were sent to Plaintiff's house in 2015, and Defendants represented to Smith that they had sent fewer boxes than were actually received. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 95-96.) Plaintiff believes that this incomplete information was to retaliate against her for filing complaints with the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.*). Plaintiff speculates that there may have been telephone conversations providing further factual support for her belief that Defendants provided incomplete information to Smith in retaliation. (*Id.* at 99.)

Plaintiff attempted to return to work on September 21, 2015. (*Id.* at 141.) On that day, she did not call any doctors or pharmacists to sell Teva products, but instead performed administrative and other tasks from her home to prepare herself to perform sales-related work. (*Id.* at 141-42, 144, 152.) Plaintiff's superior, Rothweiler, instructed her that she could not return to work until she provided Teva with a medical clearance from her doctor. (*Id.* at 152-53.) Plaintiff obtained medical clearance from her doctor, but the clearance restricted her to driving

only four hours per day. (*Id.* at 153-54.) Plaintiff's doctor also restricted her to only twenty

minutes of typing on her computer at a time. (*Id.* at 154.) As for weight-lifting restrictions,

Plaintiff was restricted to lifting three pounds. (*Id.*) Bobrowski forwarded Plaintiff's doctor's

recommendations to Work Care, and Work Care sought further clarification from Plaintiff's

doctor. (*Id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 27.) Teva's policy required this process of

clearing Plaintiff's return-to-work request with Work Care. (*Id.*, R. 30-9, Bobrowski Feb. 28

Dep. Tr. at 50.)

Another requirement in Teva's policy was for Defendants to meet with Plaintiff to help

them understand and implement any reasonable accommodations that would allow Plaintiff to

return to work. (*Id.* at 50-52.) Bobrowski contacted Plaintiff to meet with him, Rothweiler, and

Muller in Kansas City in early November to ask more questions about Plaintiff's ability to do her

job. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 159.) The meeting was scheduled for November

3, 2015, and Plaintiff did not attend because she had jury duty. (*Id.* at 160.) Plaintiff also

declined any meeting because she believed that she had already satisfactorily explained to

Bobrowski that she could perform her job. (*Id.* at 160-63.)[8] Plaintiff was then asked to attend a

meeting at a hotel conference room in Chicago with Rothweiler, but Plaintiff declined to attend

that meeting without her attorney and a court reporter. (*Id.* at 196-97, 231, 354; *see also id.*,

R. 30-8 at 50, Rothweiler Nov. 9, 2015, Email.)[9] Plaintiff ultimately did not meet with

Rothweiler and had an exploratory surgery on her spine in November 2011 to determine whether

---

[8] Plaintiff claims that she was asked to meet Muller alone in a hotel room, (*id.*, R. 39, Pl.'s Resp. to Defs.'
SOMF ¶ 36), but this claim is not supported by the record. The portions of her deposition she cites to merely
indicate that Bobrowski, Rothweiler, and Muller questioned her ability to perform her job. (*Id.*, R. 40-2, Keen March
29-30 Dep. Tr. at 158-59.) She also testified that she was asked to meet Rothweiler, not Muller, at a Chicago hotel,
and that the meeting would be in a conference room. (*Id.* at 171-73, 196-97, 354.)

[9] Plaintiff claims that these meetings were pretextual, but she offers no factual support for this claim. Instead she
cites to portions of Bobrowski's deposition transcript that relate to Work Care and an email relating to her disability
benefits claim. (*Id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 31.)

she needed any further surgery on her spine. (*Id.*, R. 40-2, Keen March 30, 2017, Dep. Tr. at 199; *see also id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 39.) Following this surgery, it was discovered that her prior spinal surgeries had been unsuccessful, which prompted her doctors to perform further corrective surgery. (*Id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 40.)

Plaintiff could not return to work in 2015, and did not endeavor to return to work until April 2016. (*Id.* at 202-04.) On August 7, 2015, Susan Duff, a Teva benefits analyst, informed Plaintiff that because she had exhausted her FMLA leave and had not been able to return to work, Teva was going to initiate a health insurance plan on her behalf pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq.* (*Id.*, R. 30-8 at 36, Duff Aug. 7, 2015, Letter to Keen.) Plaintiff believes she was retaliated against by being placed on COBRA because TEVA "had never done that before." (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 326.)

During the time Plaintiff was on medical leave, she did not use her company car for any business purposes. (*Id.* at 166-68.) Plaintiff learned from Bobrowski that Teva was taking away her company car for that reason, and she believed that this decision was retaliatory even though she only used the car to attend physical therapy and "store [Teva] promotional items in it." (*Id.* at 170.) Defendants decided to take away Plaintiff's company car because, under their policy, Defendants will retrieve an employee's company car if the employee has been away from work an extended period of time and has exhausted his or her FMLA leave. (*Id.*, R. 30-9, Bobrowski Feb. 28 Dep. Tr. at 119-20, 123.)

Additionally, while her workers' compensation claim was pending, Plaintiff learned that she was under surveillance in September 2015. (*Id.* at 214-216, 218-20.) Defendants hired a company to watch Plaintiff in order to test the merits of her workers' compensation claim. (*Id.*,

R. 30-9, Bobrowski Feb. 28 Dep. Tr. at 47-48.) The surveillance tape, however, played no role in Teva's decision whether to permit Plaintiff to return to work. (*Id.* at 45.)

After November 2015, Plaintiff only communicated with Defendants to provide them updates on her health and to send Defendants her expense reports. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 232-35; *see also id.* R. 30-8 at 55, Keen Nov. 16, 2015, Letter to Rothweiler; *id.*, R. 30-8 at 56, Nov. 11, 2015, Dr. Lee Letter; *id.*, R. 30-8 at 57, Strnad Feb. 29, 2016, Letter.) Plaintiff then received a letter from Teva on April 21, 2016, informing her that Teva had terminated her employment. (*Id.*, R. 30-8 at 58, April 21, 2016, Termination Letter.) From April 2015 to April 2016, Plaintiff did not make a single sales call to a physician or pharmacy. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 239.) This absence was in addition to Plaintiff's approximately five-month long absence in 2014, nine-month absence in 2013, three-month absence in 2012, and more than four-month absence in 2011. (*Id.* at 245-48; *see also id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶¶ 3-6.)

### XIII.  Plaintiff's IDHR and EEOC Complaints

Throughout her employment with Defendants, Plaintiff filed several discrimination complaints against Defendants with federal and state agencies. On September 23, 2013, Plaintiff filed claims alleging discrimination and retaliation with the Illinois Department of Human Rights ("IDHR") and EEOC. (*Id.*, R. 28, Answer to Am. Compl. at 7-8.) On July 15, 2014, Plaintiff filed gender and disability discrimination claims as well as retaliation claims with the EEOC and IDHR. (*Id.* at 24.) On July 21, 2015, Plaintiff filed more discrimination and retaliation claims against Defendants with the EEOC and IDHR. (*Id.* at 56-57.) Finally, on February 1 and July 21, 2016, Plaintiff again filed discrimination and retaliation claims with the EEOC. (*Id.* at 72, 83.)

## PROCEDURAL BACKGROUND

On November 12, 2014, Plaintiff filed an action in the Circuit Court of Cook County asserting claims under the IHRA for discrimination and retaliation. (14-cv-9626, R. 1 at 8, State Court Compl.) Pursuant to 28 U.S.C. § 1332, Defendants removed the lawsuit to this Court on the grounds of diversity jurisdiction, and the case was assigned case number 14-cv-9626. (*Id.*, R. 1, Notice of Removal ¶¶ 1-6.)

As discovery unfolded, Plaintiff filed a series of amended complaints and, on January 11, 2016, Plaintiff filed a 27-count, 113-page fourth amended complaint. (*Id.*, R. 72, Fourth Am. Compl.) On March 31, 2016, Defendants filed a motion for summary judgment. (*Id.*, R. 81, Mot. for Sum. J. at 1). While that motion was fully briefed and the Court was in the process of resolving it, on October 24, 2016, Plaintiff filed another complaint in this District, which was assigned case number 16-cv-9964. (16-cv-9964, R. 1, Compl.)

On March 3, 2017, the Court consolidated case 14-cv-9626 into case 16-cv-9964 and permitted Plaintiff to file an amended complaint that included all of her claims in both actions. (*Id.*, R. 25, Min. Entry.) On March 8, 2017, Plaintiff filed her first amended complaint in the later-filed case, which is now the operative complaint governing the two consolidated cases. (*Id.*, R. 26, Am. Compl.) Plaintiff's first amended complaint alleges 37 counts against Defendants: discrimination against Plaintiff based on her disability in violation of the ADA and IHRA (Counts 1, 2, 12, 13, 20, 21, 23, 25, 28, 37); discrimination against Plaintiff on the basis of her gender in violation of Title VII and the IHRA (Counts 12, 14, 21, 22, 24, 26, 29, 36); retaliation against Plaintiff in violation of the ADA, Title VII, and IHRA (Counts 3, 4, 5, 6, 7, 8, 15, 16, 17, 18, 23, 24, 25, 26, 27, 30, 32, 35); violation of the IWA (Counts 9, 10, 11, 19, 31, 34); and

retaliatory discharge under Illinois law for terminating Plaintiff after she filed claims with the IWCC (Count 33). (*Id.* at 1-173.)

On May 22, 2017, Defendants filed a "supplemental" motion for summary judgment, which renews their motion for summary judgment on Plaintiff's claims that were consolidated from case number 14-cv-9626, and also moves for summary judgment on the additional claims filed in case number 16-cv-9964. (*Id.*, R. 30, Suppl. Mot. for Summ. J.; *id.*, R. 30-1, Mem. at 1. n.1.) In their motion, Defendants argue that Plaintiff has not put forth sufficient evidence of discrimination or retaliation for those claims to survive summary judgment. (*Id.*, R. 30-1, Mem. at 1-2.) Defendants assert that they are entitled to summary judgment on Plaintiff's IWA and retaliatory discharge claims because Plaintiff is not a "whistleblower" within the meaning of the IWA, and because she produces no evidence connecting her termination and her filing of workers' compensation claims. (*See id.* at 2-3, 13.) Finally, Defendants argue that the Court should enter summary judgment on Plaintiff's retaliation claims because Plaintiff provides no connection between any protected activity and an adverse employment action. (*Id.* at 11-15.) In response, Plaintiff argues that numerous issues of fact preclude summary judgment. (*Id.*, R. 38, Resp. at 9-15.)

On October 13, 2017, Plaintiff filed a motion to strike parts of Defendants' reply and for sanctions against Defendants. (*Id.*, R. 47, Mot. to Strike Reply.) Plaintiff contends that Bobrowski's affidavit filed with Defendants' reply brief includes intentionally false statements and facts not included with Defendants' original Local Rule 56.1 statement of facts. (*Id.* at 1-10.) Plaintiff also argues that Bobrowski's affidavit is "hearsay" and contradicts his prior testimony as well as other documents that are part of the record. (*Id.* at 3-10.) Plaintiff argues that because of the claimed falsehoods and deficiencies with Bobrowski's affidavit, the Court should strike

Bobrowski's affidavit and pages 1-15 of Defendants' reply brief. (*Id.* at 10.) Plaintiff also submits that the Court should sanction Defendants for allegedly "attempting to completely alter [their] defense at the last minute" and for acting in a "dishonest" manner before the Court. (*Id.*)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016), *cert. denied sub nom. Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 137 S. Ct. 310 (2016).

The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "Conclusory statements, not grounded in specific facts" also cannot defeat a motion for summary judgment.

*Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (citation and internal alteration omitted). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

In deciding the motions, the Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

### I.     Disability Discrimination

The ADA prohibits employers from discriminating against a "qualified individual" because of her disability. 42 U.S.C. § 12112(a); *see also A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) ("[T]he ADA state[s] that discrimination against disabled individuals is prohibited 'on the basis of' or 'by reason of' their disability.' "). "[D]isability discrimination under the . . . ADA can be established in three different ways: (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *A.H.*, 881 F.3d at 592-93 (citation and internal quotation marks omitted). Plaintiff's disability discrimination claims are either claims that Defendants intentionally discriminated against her on the basis of her disability or that Defendants failed to provide her a reasonable accommodation. In either situation, Plaintiff must prove that "but for" her disability, Defendants would not have taken an adverse action against her or denied her a reasonable accommodation. *See id.* at 593

("This language requires [the plaintiff] to prove that, but for his disability, he would have been able to access the services or benefits desired." (citation and internal quotation marks omitted)); *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) ("To establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether [her] disability was the 'but for' reason for the adverse action[.]").

"To show that disability discrimination was the 'but for' reason" for an adverse employment action, "a plaintiff can use either direct or circumstantial evidence." *Id.* "Direct evidence would be an admission that the defendant" took the adverse employment action "on the basis of [the employee's] disability." *Id.* at 504. Circumstantial evidence may include:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Id.* (citation omitted); *see also Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013) (observing that such types of evidence may be combined to present a "convincing mosaic of circumstantial evidence from which a factfinder can make a reasonable inference of discriminatory intent" (citation and internal quotation marks omitted)). Whether Plaintiff relies on direct or circumstantial evidence, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 956 (N.D. Ill. 2016) (applying the same rule in a disability discrimination case). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

"If an ADA plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision. If the employer succeeds, then the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 839 (7th Cir. 2012) (citation omitted); *see also Ortiz*, 834 F.3d at 765 (pointing out that this burden-shifting framework for employment discrimination claims is still intact and applicable to such claims). An IHRA claim for disability discrimination is analyzed under the same framework as an ADA disability discrimination claim. *McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038, 1043 (N.D. Ill. 2017) (analyzing ADA and IHRA claims under the same legal standard); *Nutall v. Terminals*, No. 1:14 CV 4738, 2015 WL 9304350, at *8 (N.D. Ill. Dec. 22, 2015) ("The Illinois Supreme Court instructs that in evaluating claims of discrimination brought under the IHRA, courts should apply the same test employed by federal courts in evaluating causes of action brought pursuant to . . . the ADA.").[10]

Defendants argue that Plaintiff has failed to present sufficient evidence to survive summary judgment on her claims under the ADA. (16-cv-9964, R. 30-1, Mem. at 4; 14-cv-9626, R. 81-1, Mem. at 3.) The Court addresses each claim below.

## A. Intentional Acts of Discrimination

To prove a claim of disability discrimination, Plaintiff "must show that: (1) [s]he is disabled; (2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by [her] disability." *Monroe*, 871 F.3d at 503. For purposes of this determination, the adverse job action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."

---

[10] Plaintiff argues that *Lake Point Tower, Ltd. v. Ill. Human Rights Comm'n*, 904, 684 N.E.2d 948, 953 (Ill. App. Ct. 1997) stands for the proposition that the IHRA and ADA require entirely different legal analyses, but it does not—it instead notes that the ADA definition of "handicap" is different from the IHRA definition of "handicap."

*Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (citation omitted). "[A] materially adverse change" in one's job "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (citation, internal quotation marks, emphasis, and alteration omitted).

The conduct Plaintiff complains of is: (1) Defendants' directive that Plaintiff return to work in June 2013 and their alleged refusal to allow her to return until September 2013, (16-cv-9964, R. 26, Am. Compl. at 1-20); (2) Defendants' failure to promote Plaintiff to SESS, (*id.* at 54-61); (3) Defendants' alleged failure to pay Plaintiff her full 2013 bonus and their conduct that humiliated her in connection with the "Make it Happen" sales contest, (*id.* at 85-94); (4) Defendants' denial of Plaintiff's request for excess insurance coverage, (*id.* at 102-07); (5) her poor 2014 performance review, (*id.* at 111-17); (6) Muller's ridicule of her disability and requests for accommodations, (*id.* at 128); (7) the shipment of Teva promotional materials to her house in 2015, (*id.* at 129-30); (8) Defendants' alleged dissemination of false information to Scott Insurance regarding Plaintiff's workers' compensation claim, (*id.* at 130); (9) Defendants' refusal to assign her a medical case manager, (*id.*); (10) Defendants' denial of workers' compensation and short-term disability benefits, (*id.*); (11) Defendants' request that Plaintiff sign a reimbursement agreement for disability benefits, (*id.*); (12) Defendants taking away her company car and placing her on COBRA health insurance, (*id.* at 131); (13) Defendants' alleged insistence that she meet her male supervisor alone in a hotel room, (*id.*); (14) Defendants' alleged refusal to allow her to return to work in September 2015, (*id.*); (15) Defendants' video

surveillance of Plaintiff and her daughter, (*id.*); and (16) Defendants' termination of her employment, (*id.* at 167-72). The Court will address each claim in turn.

### 1. Plaintiff's Attempts to Return to Work in 2013

Plaintiff fails to present any evidence showing that her return to work would not have been delayed in June 2013 but for her disability, *A.H.*, 881 F.3d at 593; nor does she provide any circumstantial evidence that gives rise to a reasonable inference of discrimination, *Teruggi*, 709 F.3d at 660. Plaintiff fails to cite any evidence showing that Defendants denied her return on June 3, 2013, for any reason other than the fact that her doctor instructed Defendants that she could not to return to work until she had the surgery that ultimately took place in July 2013.[11] (14-cv-9626, R. 86-5, Keen Oct. 14 Dep. Tr. at 75-77; *id.*, R. 86-8, Bobrowski Oct. 19 Dep. Tr. at 98, 104-07.) Although Plaintiff submitted the Checklist indicating she could return to work on June 3 with physical restrictions, Defendants instructed her not to return because they believed she needed surgery. (*Id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 74.) Their belief was accurate, as there is no dispute that Plaintiff's doctor had scheduled a surgery for Plaintiff that had not yet occurred and did not occur until July. (*Id.* at 77.) Because Defendants have proffered legitimate, nondiscriminatory reasons for delaying Plaintiff's return to work, she "must produce evidence that those reasons were actually pretext for discrimination." *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017). She, however, does not provide any evidence showing pretext. Consequently, summary judgment is proper on these claims.

Plaintiff argues that Defendants' decision to make her undergo a second examination before she returned to work in September was "hogwash or pretext." (14-cv-9626, R. 87, Mem. at 21.) Plaintiff was informed that she had to undergo a second test because the first test found

---

[11] The Court notes that "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [s]he relies." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (citation omitted).

that her neck was normal, but the first test failed to indicate that her neck had a "scar or something to that effect." (*Id.*, Keen Oct. 14 Dep. Tr. at 86-87.) Plaintiff fails to present any evidence, however, showing that Defendants' proffered explanation was a lie or that the second examination would not have been requested pursuant to Defendants' normal course of business. *See Deacon v. Peninsula Chi., LLC*, No. 16-CV-1464, 2017 WL 3531518, at *12 (N.D. Ill. Aug. 17, 2017) ("[The plaintiff's] dispute with . . . [the defendant's] decisions based on . . . [company] policy, without more, does not lead to the inference that his termination was based on his disabilities."). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is lie, specifically a phony reason for some action." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (citation and internal quotation marks omitted). Plaintiff also argues that Defendants' reason for asking her to undergo a second test had nothing to do with her ability to return to work, (14-cv-9626, R. 87, Mem. at 21), but the possibility that the results of the first test might be unreliable did relate to Plaintiff's ability to return to work since Defendants needed to verify Plaintiff's fitness to return. Accordingly, Plaintiff's claims cannot survive summary judgment. *See Ennin*, 878 F.3d at 596; *Deacon*, 2017 WL 3531518, at *12.

## 2. The SESS Position

Plaintiff's next disability discrimination claims relate to Defendants' decision to deny her the SESS position. Defendants argue that the Court should grant summary judgment because there was a legitimate, non-discriminatory reason she was not selected for the position that Plaintiff fails to refute. (14-cv-9626, R. 81-1, Mem. at 11.) The Court agrees.

Plaintiff does not genuinely dispute that one of the criteria for the SESS position was to demonstrate qualities of a "leader," "mentor," and "role model." (*Id.*, R. 81-12 at 11-14, Promotional Guidelines; *see also id.*, R. 89; Defs.' Resp. to Pl.'s SOAMF ¶ 13.) Plaintiff also

fails to provide any evidence that disputes the substantial evidence showing that she was not

considered a leader, mentor, or role model by her superiors at the time she was being considered

for the SESS position. Stanek and Bischoff both had a strong belief that Plaintiff was not a

leader, mentor, or role model, and they expressed these opinions to Muller at the time Plaintiff

was being considered for the SESS position. (*Id.*, R. 86-10, Muller Dep. Tr. at 58l; *id.*, R. 86-12,

Bischoff Dep. Tr. at 23-25; *id.*, R. 86-16, Stanek Dep. Tr. at 29-30, 47.) Thus, to survive

summary judgment and overcome Defendants' legitimate, nondiscriminatory reasons, Plaintiff

must present evidence that those reasons were actually pretext for discrimination. *Ennin*, 878

F.3d at 596. Plaintiff provides no evidence showing that Bischoff and Stanek were lying about

their beliefs, or that their beliefs were pretextual. Instead she argues, without support, the fact

that she was not considered a leader, mentor, or role model was an "after-the-fact" explanation

conjured up by Defendants to justify denying her the SESS position. On summary judgment,

however, she must offer evidence—not arguments—that create a genuine dispute of material

fact. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (noting that summary

judgment requires the non-moving party to respond "by identifying specific, admissible evidence

showing that there is a genuine dispute of material fact"). Thus, the Court concludes summary

judgment is proper on Plaintiff's disability discrimination claims based on her denial of the SESS

position.

 Looking at the record in its entirety, Plaintiff fails to create a triable issue of fact

sufficient to survive summary judgment. *See Ortiz*, 834 F.3d at 765. First, she argues that

Bischoff's email stating that her "medical limitations and leave of absence . . . had a significant

impact on" her "ability to perform this year at a high level" was an "admission" that Defendants

denied her the SESS position because of her disability.[12] (14-cv-9626, R. 87, Mem. at 20-21.)
This email, however, lacks any connection to Plaintiff's lack of leadership, mentor, or role model
qualities, which was the stated reason for her denial of the SESS position. Bischoff's email
instead related to Plaintiff's objective sales performance and failure to make the "President's
Club," which was not the proffered reason for denying her the SESS position. (*See id.*, R. 86-12
at 16, Bischoff Nov. 14, 2012, Email.) Additionally, any decision to designate Plaintiff as an
SESS was not Bischoff's alone to make—that decision was made in conjunction with Teva's
other sales directors. (*Id.*, R. 86-10, Muller Dep. Tr. at 58.) There is no evidence indicating that
Bischoff's thoughts in his email, even assuming they are evidence of pretext, were ever shared
with the other sales directors in the Committee. Therefore, even if the Court accepted Plaintiff's
argument that Bischoff's email is evidence of pretext, the Court would have to entertain several
layers of speculation to conclude that the Committee denied her the position because of her
disability, and speculation is not permitted on a motion for summary judgment. *Springer v.
Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("It is well-settled that speculation may not be
used to manufacture a genuine issue of fact." (citation and internal alteration omitted)).
Bischoff's email, when viewed together with the other evidence, does not provide circumstantial
evidence that would allow a reasonable jury to conclude that Plaintiff was denied the SESS
position because of her disability.

Plaintiff also claims that she was far more qualified for the SESS position than other non-
disabled men promoted to SESS, but she fails to provide evidence that these men were similarly
situated to Plaintiff in that they were not considered mentors, role models, or leaders by their

---

[12] Plaintiff claims that Muller "admitted" he denied her the position because of her disability, but the portions of the
record she cites to do not evidence any such admission. (*See* 14-cv-9626, R. 86-5, Keen Oct. 14 Dep. Tr. at 115-16.)

superiors.[13] (*See* 14-cv-9626, R. 86-2, Pl.'s SOAMF ¶¶ 24-26.) Plaintiff also submits evidence

showing that she received praise about her leadership in 2010 to argue that Defendants' proffered

reason for denying her the SESS position was pretextual. (*Id.* ¶¶ 14-16.) This evidence, however,

is insufficient to raise a reasonable inference of pretext or create a genuine dispute of fact.

Though Plaintiff was praised once for her leadership in a 2010 performance review, (*id.*, R. 86-

16, Stanek Dep. Tr. at 89),[14] it is undisputed that when it came time to consider her SESS

candidacy, none of her supervisors considered her a leader, mentor, or role model. (*Id.*, R. 86-10,

Muller Dep. Tr. at 109-10.) Without any evidence to dispute these facts or show that these

opinions were pretext for a discriminatory motive, the Court finds that the evidence is not

enough to support a reasonable inference of discrimination. Thus, the Court grants summary on

Plaintiff's disability discrimination claims relating to the SESS position.

### 3. The 2013 Bonus and "Make It Happen" Sales Contest

As a preliminary matter, the Court finds, as a matter of law, that listing Plaintiff as

ineligible for the "Make it Happen" sales contest is not an adverse job action giving rise to a

viable discrimination claim. Defendants ultimately allowed Plaintiff to participate in the contest,

but Plaintiff testified that she suffered "great humiliation and embarrassment." (*Id.*, R. 89, Defs.'

Resp. to Pl.'s SOAMF ¶ 37.) Such "embarrassment" without any tangible change in her

employment is not an actionable adverse job action. *See Jones v. Res-Care, Inc.*, 613 F.3d 665,

671 (7th Cir. 2010) ("[U]nfair reprimands or negative performance evaluations, unaccompanied

---

[13] *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) ("We have cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." (citation and internal alteration omitted)).

[14] There is no indication that Stanek's comparisons of Plaintiff to Lou Holtz as an "inspiration" implicate her leadership, role model, or mentor skills. (*See* 14-cv-9626, R. 86-16, Stanek Dep. Tr. at 111 (stating that she compared Plaintiff to Lou Holtz to give her credit for doing "well with sales").) Plaintiff also points to her own characterization of a statement made by James Reilly, a vice president of sales, but that statement makes no mention of Plaintiff's leadership, role model, or mentor qualities. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 149-50.)

by some *tangible* job consequence, do not constitute adverse employment actions." (citation omitted) (emphasis in original)); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (noting that a "reprimand is not an adverse employment action unless the letter is accompanied by some other action, such as job loss or demotion" (emphasis omitted)). Thus, the Court grants summary judgment on Plaintiff's disability discrimination claims related to the "Make it Happen" sales contest.

With respect to Plaintiff's claims that she did not receive her full bonus in 2013, Plaintiff points to no evidence showing that this occurred because of her disability. Instead, the record shows that Plaintiff's reduced bonus was the result of a straightforward application of Defendants' compensation policy. (14-cv-9626, R. 86-10, Muller Dep. Tr. at 114-15.) As noted above, Teva's 2013 Annual Incentive Plan states that "[l]eaves of absence will impact incentive eligibility in proportion to the length of the leave, with the exception of an approved leave that qualifies under FMLA, the Parental Leave Policy and/or the Military Leave Policy." (*Id.*, R. 81-6 at 10, Annual Incentive Plan.) Plaintiff's leave in 2013 was not taken under the FMLA, (*id.*, R. 86-5, Keen Oct. 14 Dep. Tr. at 62), and there is nothing to demonstrate that such leave was taken pursuant to Teva's parental or military leave policies. Defendants offer a legitimate, non-discriminatory reason for her reduced bonus and Plaintiff simply fails to produce any evidence showing that this reason was pretextual. *Ennin*, 878 F.3d at 596. Accordingly, summary judgment is appropriate as to her disability discrimination claims premised on her 2013 bonus.

### 4.     Denial of Excess Insurance Coverage

It is undisputed that Plaintiff did not automatically qualify for Defendants' excess insurance benefit. (14-cv-9626, R. 81-18, Rohach Aff. ¶¶ 2, 3, 5.) Thus, her claims fail because "an adverse employment action, does not include an employer's refusal to grant an employee a

discretionary benefit to which she is not automatically entitled[.]" *Hottenroth v. Vill. of Slinger*,

388 F.3d 1015, 1033 (7th Cir. 2004).[15] In addition, when pressed, Plaintiff could offer no

explanation as to how Defendants discriminated against her based on her disability by not

offering her excess insurance coverage. Instead, her testimony was simply that she "should have

gotten" that benefit, without any further explanation. (14-cv-9626, R. 86-6, Keen Oct. 15 Dep.

Tr. at 89-94.) Thus, summary judgment is warranted on these claims. *See A.H.*, 881 F.3d at 593.

### 5.    The 2014 Performance Review

Plaintiff's disability discrimination claims based on her negative 2014 performance

review also fail because she fails to present evidence showing that the negative review would not

have happened "but for" her disability. The Court's "concern is not the wisdom or fairness of the

rating, but whether it was [the defendant's] honest appraisal of plaintiff's performance, rather

than a product of or screen for discriminatory animus." *Moore-Fotso v. Bd. of Educ. of the City*

*of Chi.*, 211 F. Supp. 3d 1012, 35 (N.D. Ill. 2016) (citation omitted). Plaintiff claimed her poor

2014 performance review was based upon the inclusion of physicians that should have not been

included in her sales quota calculation, but there is no evidence that Defendants included these

physicians because of her disability. (14-cv-9626, R. 86-6 at 52-53, Keen Rebuttal.) Plaintiff was

also criticized for failing to provide Rothweiler her developmental goals, but Plaintiff responded

that she failed to do so because she was on medical leave at the time when other sales

representatives developed those goals. (*Id.* at 53.) She does not present any evidence, however,

showing that she was prevented from sending Rothweiler her goals after she returned from leave,

or that Rothweiler's criticism would not have happened "but for" her disability. (*Id.*) Plaintiff

also complained in her rebuttal about Rothweiler criticizing her for not attending a "selling

---

[15] *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996) ("And in analyzing claims under the ADA, it is appropriate to borrow from our approach to the respective analog under Title VII.").

skills" class. (*Id.*) Plaintiff, however, presents no evidence that her failure to attend the class was causally connected to her disability, as opposed to scheduling issues and miscommunications between Plaintiff and Rothweiler. (*Id.* at 53-54.) Plaintiff complained that she also lacked the benefit of an interim review upon her return from leave, but again fails to offer evidence that Defendants would have given her an interim review if not for her disability. (*Id.* at 54.)

Plaintiff's rebuttal to her performance review went on to attack Rothweiler's criticisms about her failure to collaborate with other sales representatives. (*Id.* at 54, 57-58.) These attacks, however, do not present any evidence connecting Rothweiler's criticisms with her disability. (*See id.*) She also disputed Rothweiler's criticism of her ability to handle administrative tasks, but again offers no evidence linking Rothweiler's criticisms to her disability. (*Id.* at 55.) Rather, her rebuttal stated that "some of these issues were above" Rothweiler and "were not the type of 'business issues' he was accustomed to dealing with[.]" (*Id.*)

Plaintiff's rebuttal then took issue with Rothweiler's criticisms regarding her failure to focus on customers that had the greatest impact on her sales numbers. (*Id.*) She claimed, however, that this was due to management providing her a bad "call plan," and she presents no evidence that Defendants would have given her a better call plan but for her disability. (*Id.* at 55-57.) Plaintiff also claimed that Rothweiler's criticism relating to her lack of activity in Indiana was unfair because Defendants ignored her request to modify her Indiana territory. (*Id.* at 57.) This claim, however, is not supported by the record, which shows that Defendants considered her request at length and denied it because she refused to cooperate with Work Care and failed to provide documentation from her doctors stating that such a modification was necessary. (*See id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 133-37; *id.*, R. 81-15, Greaney Aff. ¶¶ 1-6.)

The next item on Plaintiff's rebuttal was that she had to deal with Work Care to resolve her medical leave issues, instead of a dedicated Teva employee. (*Id.*, R. 86-6 at 58, Keen Rebuttal.) She does not point to any evidence, however, showing that Defendants outsourced management of employee medical leave issues because of her disability. (*Id.*) She claims that Rothweiler failed to provide her guidance on medical issues, but again provides no evidence that this failure was because of her disability. (*Id.* at 59.) Additionally, as noted above, this was outside of Rothweiler's domain and instead Work Care's responsibility. (*Id.* at 55.)

Plaintiff also claimed that Rothweiler's criticisms related to her event programming and late expense reports were unfair because she experienced problems securing funding for events, (*id.* at 59-60), but again she offers no evidence showing that Rothweiler's criticisms were based on her disability. Next, her rebuttal claimed that Muller was "disruptive" and "demeaning towards" her during an in-person discussion of the 2014 performance review. (*Id.* at 60.) Her rebuttal, however, did nothing more than disagree with Muller's criticisms, and it failed to provide a causal link between Muller's criticisms and her disability. (*Id.* at 60-62.) Plaintiff's rebuttal states that, at the end of the in-person review, Muller brought up one of Plaintiff's requested accommodations, but Plaintiff provides no evidence connecting Muller, her disability, and the poor performance review, other than her opinion that "[i]t *seems to me* that because I had requested the disability accommodation, I had to endure a wrongful review for 2014 not from my manager, but from my director." (*Id.* at 62 (emphasis added).) Her opinion is insufficient to create a genuine dispute of fact. *See Stern v. St. Anthony's Health Ctr.*, No. 12-CV-785-SCW, 2013 WL 5967746, at *4 (S.D. Ill. Nov. 8, 2013), *aff'd*, 788 F.3d 276 (7th Cir. 2015) ("[T]he testimony is still just [the plaintiff's] subjective opinion, and insufficient to defeat a motion for summary judgment.").

Plaintiff's rebuttal then described Muller's inappropriate sexual comments, but she offers no evidence showing how Muller's conduct resulted in a poor 2014 performance review because of her disability. (*See* 14-cv-9626, R. 86-6 at 63-64, Keen Rebuttal.) The Court, therefore, concludes that, without any evidence of causation, Plaintiff's disability discrimination claims cannot survive summary judgment. *Monroe*, 871 F.3d at 503. Summary judgment is also appropriate because Plaintiff does not provide any evidence of pretext that would cast doubt on the legitimate, nondiscriminatory reasons Plaintiff received a poor performance review. *Ennin*, 878 F.3d at 596.

### 6. Having Her Disability and Requests for Accommodation Ridiculed by Muller

Plaintiff complains that she "felt" Muller "belittled" her and was "dismissive" of her disability and requests for accommodation. (14-cv-9626, R. 86-6 at 62, Keen Rebuttal; *id.*, R. 26. Am. Compl. ¶ 21(a).) This, however, does not rise to the level of an adverse employment action. *See Lavalais*, 734 F.3d at 634. Plaintiff fails to point to any evidence showing that any of Muller's comments rose to the level of a termination, demotion, less distinguished title, or material loss of any benefit or responsibility. (14-cv-9626, R. 86-6 at 62, Keen Rebuttal.) She also fails to provide any evidence showing a nexus between Muller's conduct and her poor performance review. (*Id.* at 60-62.) Accordingly, Plaintiff cannot maintain her disability discrimination claims on this ground. *See Lavalais*, 734 F.3d at 634; *Monroe*, 871 F.3d at 503.

### 7. Boxes of Teva Promotional Materials Sent to Plaintiff in 2015

Plaintiff cites to no evidence showing that Defendants would have refrained from sending her boxes of promotional materials in 2015 if not for the fact that she was disabled. (*See* 14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 61; *id.*, R. 86-2, Pl.'s SOAMF; 16-cv-9964, R. 39, Pl.'s Resp. to Defs.' SOMF; R. 40, Pl.'s SOAMF.) Indeed, Plaintiff could not testify as to any

particular individual within Teva who sent her the boxes, much less provide any evidence showing that particular individual knew of Plaintiff's disability. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 84-85.) Thus, her disability discrimination claims fail. *See A.H.*, 881 F.3d at 593. Additionally, Defendants' shipment of boxes is not an adverse employment action, and her claims fail for this reason as well. *See Lavalais*, 734 F.3d at 634.

### 8. Claim that Defendants Gave Scott Insurance False Information

In response to Plaintiff's workers' compensation claims, Scott Insurance was investigating the 2015 shipments of Teva promotional materials to Plaintiff, and Defendants indicated to Scott Insurance that they had sent fewer boxes than Plaintiff actually received. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 95-96.) Plaintiff surmises that there may have been conversations providing support for her belief that Muller gave Scott Insurance incomplete information to retaliate against her. (*See id.* at 99.) Such evidence is insufficient at this stage. *See Grant*, 870 F.3d at 568. Thus, Plaintiff's claims related to Scott Insurance cannot survive summary judgment. *See A.H.*, 881 F.3d at 593; *Lavalais*, 734 F.3d at 634.

### 9. Allegedly Refusing to Assign Plaintiff a Medical Case Manager

Plaintiff also fails to come forward with any evidence to support her claims related to Defendants' failure to assign her a medical case manager. In April 2015, Teva did not promptly provide Plaintiff with a case manager to address medical issues resulting from her April 2015 surgery. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 99-100.) The Court reiterates that "an adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled[.]" *Hottenroth*, 388 F.3d at 1033. Plaintiff did not understand that Teva had an obligation to assign her a case manager, but instead she believed that the assignment of a case manager was "the process [she] was supposed to go

through as an employee." (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 100.) Thus, Plaintiff's claims cannot survive summary judgment because she offers no evidence that she was automatically entitled to a medical case manager.

Even if Defendants had an obligation to assign Plaintiff a medical case manager, there is no evidence that Defendants would have provided her one but for her disability. It is undisputed that Defendants' failure to assign her a medical case manager was not because of any reason individual to Plaintiff but simply part of Defendants' outsourcing of medical leave issues to Work Care. (*See id.* at 105-10.) Additionally, Plaintiff was ultimately assigned the equivalent of a medical case manager through Work Care. (*See id.* at 109.) Accordingly, summary judgment is proper on Plaintiff's claims. *See A.H.*, 881 F.3d at 593.

### 10.    Denial of Workers' Compensation and Disability Benefits

Next, Plaintiff claims that she never received any workers' compensation or disability benefits because of her disability. (16-cv-9964, R. 26, Am. Compl. at 130.) She, however, fails to cite any evidence showing that she would have received such benefits if not for her disability. The record reflects, without any genuine dispute, that Plaintiff was denied these benefits for reasons unrelated to her disability, and that Defendants' third party vendors largely made these decisions instead of Defendants. Defendants' third party vendor that handled Teva's disability benefits program, Matrix, informed Plaintiff that she would not receive disability benefits because she made a claim for a workplace injury—an injury that was excluded under the disability benefits policy. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 114-15.) Plaintiff did not receive workers' compensation payments because her workers' compensation claim was still pending. (*Id.* at 115, 121.) Plaintiff simply fails to present any evidence that she would have received disability or workers' compensation benefits but for the fact that she was disabled,

which is fatal to her claims. *See Monroe*, 871 F.3d at 503. Indeed, she has not come forward with evidence identifying the person that denied her benefits. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 126, 135.) She also fails to provide any evidence showing that the proffered reason for denying her disability and workers' compensation benefits was pretextual. *Ennin*, 878 F.3d at 596. Accordingly, Plaintiff cannot survive summary judgment on these claims.

### 11.     Requesting that Plaintiff Sign a Reimbursement Agreement

Matrix informed Plaintiff that she could receive disability benefits if she entered into a reimbursement agreement with Teva that required her to waive certain legal and medical costs. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 123-24, 129-30.) This conduct, however, cannot give rise to a disability discrimination claim. There is no adverse job action where a plaintiff fails to present evidence that her "benefits would change" because of the employer's action. *Douthit v. TC Heartland LLC*, No. 1:12-CV-1584-JMS-TAB, 2014 WL 1584320, at *7 (S.D. Ind. Apr. 21, 2014). Here, there is no evidence that Defendants' offer adversely changed her benefits. It is undisputed that Plaintiff failed to qualify for disability benefits because she had filed a workers' compensation claim; therefore, the reimbursement agreement would have provided her benefits she never had. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 114.) Thus, Plaintiff's claim cannot withstand summary judgment.[16]

### 12.     Taking Away Plaintiff's Company Car and Placing Her on COBRA

In 2015, Defendants took Plaintiffs' company car away from her and placed her on COBRA health insurance. (*Id.*, R. 30-8 at 36, Duff Aug. 7, 2015, Letter to Keen; *id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 166-69, 208.) Plaintiff asserts—with no supporting evidence—

---

[16] These claims also fail because Plaintiff fails to cite any evidence showing that Defendants would have offered her the reimbursement agreement if not for her disability. As noted above, Plaintiff could not identify the particular person who dealt with her disability benefits claims, much less the motivation behind that person's decision.

that her accusations of Muller's inappropriate sexual conduct precipitated these decisions, not her disability.[17] (*Id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 4.) Thus, there is no evidence from which a reasonable jury could conclude that Plaintiff's disability was the "but for" cause of Defendants' decision to take away her company car and place her on COBRA health insurance.

Instead, the record shows that on August 7, 2015, Susan Duff, a Teva benefits analyst, informed Plaintiff that because she had exhausted her FMLA leave and could not return to work, Teva was going to initiate a COBRA plan on her behalf pursuant to Teva's policy and pay for that plan until March 31, 2016. (*Id.*, R. 30-8 at 36, Duff Aug. 7, 2015, Letter to Keen.) Plaintiff claims that this was pretextual because Defendants "had never done that before," (*id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 326), but this is speculation and not evidence of discrimination from which a reasonable jury could conclude that Defendants discriminated against Plaintiff. *See Argyropoulos*, 539 F.3d at 732.

It is also undisputed that Plaintiff was not using her car for any business purpose at the time it was taken away. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 166-68.)[18] There is no dispute that, under Teva's policy, Teva may retrieve a company car if an employee has been away from work on extended leave in excess of FMLA leave. (*Id.*, R. 30-9, Bobrowski Feb. 28 Dep. Tr. at 119-20, 123; *id.*, R. 41-2 at 20, H.R. Mgmt. Guideline.) Because Plaintiff's absence exceeded her FMLA leave period, Defendants retrieved her car. (*Id.*, R. 30-9, Bobrowski Feb. 28 Dep. Tr. at 118-20.) Plaintiff offers no evidence of pretext to raise a triable issue related to

---

[17] The evidence that Plaintiff cites fails to show any nexus between her accusations against Muller and Defendants' decisions to take away her car and place her on COBRA. (*See id.*, R. 86-6 at 52-64, Keen Rebuttal; *id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 160-62; *id.*, R. 86-8, Bobrowski Oct. 19, Dep. Tr. at 14-15, 19-31, 198-199, 261-263; *id.*, R. 86-13, Stribling Dep. Tr. at 8-9, 11-20; *id.*, R. 86-14, Reilly Dep. Tr. at 6, 29, 33-37; *id.*, R. 86-10, Muller Dep. Tr. at 146-147, 150-151; 16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 208, 315-16, 323-26.)

[18] Plaintiff did not store the promotional material in the company car for any job-related purpose, but did so to clear boxes that were partially obstructing the entrance to her home. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 81-83.)

Defendants' legitimate, non-discriminatory reason for taking away her company car. *See Ennin,* 878 F.3d at 596. Accordingly, the Court grants summary judgment on these claims.

### 13. Defendants' Alleged Insistence that Plaintiff Meet Her Supervisor Alone in a Hotel Room

Plaintiff contends that Defendants "demanded that [she] either fly to Kansas City, Kansas[,] or meet in a closed hotel room downtown to be humiliated and harassed by the proven and admitted sexist pervert Teva regional director Matthew Muller," and that "Plaintiff objected to [Defendants'] attempts to put her in the same locked room with Muller as being inappropriate and unreasonable." (16-cv-9964, R. 40, Pl.'s SOAMF ¶¶ 20, 22.) These claims, however, are simply unsupported by the record.

The record shows that Bobrowski contacted Plaintiff to meet with him, Rothweiler, and Muller in Kansas City in November 2015—not alone with Muller—to ask her more questions about her ability to work. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 159.) There is no evidence that Defendants planned for Muller be in a closed hotel room alone with Plaintiff. Plaintiff could not attend this November meeting because she had jury duty. (*Id.* at 160.) Plaintiff also declined any meeting because she believed that she had already satisfactorily explained to Bobrowski that she could perform her job. (*Id.* at 160-63.) Plaintiff was then asked to attend a meeting at a hotel *conference room* in Chicago with *Rothweiler*, not Muller. (*Id.* at 171-73, 196-97, 354; *see also id.*, R. 30-8 at 50, Rothweiler Nov. 9, 2015, Email.) Given that there is no basis in the record for her claim that she was forced to meet with Muller alone in a hotel room, or for her claim that she had to "meet her male supervisor alone in a hotel room at the Chicago O'Hare Hilton," (*id.*, R. 26, Am. Compl. at 131), the Court grants summary judgment on these claims. These claims also fail because simply requesting a meeting with Plaintiff is not an adverse job action. *See Lavalais,* 734 F.3d at 634.

### 14.    Refusal to allow Plaintiff to Return to Work in September 2015

Plaintiff also asserts that Defendants refused to allow her to return to work in September 2015 "because of her disability." (16-cv-9964, R. 40, Pl.'s SOAMF ¶¶ 20, 22.) Plaintiff, however, fails to put forth enough evidence to survive summary judgment.

First, Plaintiff's claim that Defendants refused to allow her to return to work in September 2015 is unsupported by the record, because she did not even seek medical clearance to return to work until October 2015. In September 2015, Plaintiff was attempting to return to work but was not ready to do so. (*See id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 196-97.) On September 21, 2015, Plaintiff sent Rothweiler an email informing him that she performed tasks to prepare to return to work, such as reviewing unread emails, making preparations to retrieve her company car, and preparing her computer. (*Id.*, R. 41-2 at 49, Keen Sept. 21, 2015, Email.) In response, Rothweiler indicated in an email two days later that Plaintiff had not yet returned to work and was "required to abide by the company's return to work procedures." (*Id.*, R. 41-2 at 50, Rothweiler Sept. 23, 2015, Email.)

To comply with this directive, Plaintiff obtained a note from her doctor in October 2015 clearing her to return to work, but the doctor's note imposed significant limitations on her physical activity, such as: lifting no more than three pounds; driving no more than a total of four hours a day; "sessions on the computer" no longer than 20 minutes; no pushing, pulling, or carrying; and required physical therapy one to two times per week. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 153-54; *id.*, R. 41-2 at 46, Strnad Oct. 8, 2015, Note.) Work Care then sent Defendants its recommendations for Plaintiff's return-to-work accommodations on October 20, 2015, but these accommodations did not match with what Plaintiff's doctor recommended. (*Id.*, R. 41-2 at 47, Greaney Oct. 20, 2015, Email.) Specifically, Work Care recommended that

Defendants not accommodate her to completely refrain from pushing, pulling, or carrying, but that they limit her to pushing, pulling, or carrying three pounds or less. (*Id.*) Work Care then asked Defendants to let it know if they "are able to accommodate these restrictions." (*Id.*)

Work Care's recommendation left Defendants with significant questions about how to accommodate Plaintiff. The physical requirements of Plaintiff's job included daily driving, getting in and out of her car, carrying promotional materials, climbing and descending stairs, and walking to and from physicians' offices. (*Id.*, R. 28, Answer to Am. Compl. at 3.) Defendants questioned how they could accommodate "no lifting, pushing or pulling" given Plaintiff's job requirements, and they questioned whether Plaintiff could lift a briefcase or computer case out of her car. (*Id.*, R. 41-2 at 47, Greaney Oct. 20, 2015, Email.) Defendants received no response as to whether Plaintiff could lift a briefcase or computer case out of her car, and were informed that Plaintiff could perform the following activities: open a "standard office or car door," lift any object three pounds or less, and that she could "push or pull her IPAD with a three pound restriction," a statement that added little clarity to whether she could perform her essential job functions. (*Id.*) Defendants were also unclear as to how much time per day she could spend driving to fulfill her job duties because she stated that on certain days she may have to drive at least 30 minutes to attend physical therapy. (*Id.*) Finally, Work Care's recommendations offered no clarity as to the duration of these restrictions, stating that Plaintiff's doctors indicated that she would be "evaluated monthly as needed if her symptoms should change . . . [at which point] her restrictions would again be appropriately medically changed[.]" (*Id.*)

With these significant questions regarding reasonable accommodations lingering, Defendants endeavored, pursuant to Teva's policy, to meet with Plaintiff so that they could understand and implement any reasonable accommodations Plaintiff needed upon her return.

(*Id.*, R. 40-3, Bobrowski Feb. 28 Dep. Tr. at 50-52.) Bobrowski contacted Plaintiff about meeting with him, Rothweiler, and Muller in Kansas City in early November to ask more questions about Plaintiff's ability to do her job. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 159.) As noted above, however, Plaintiff resisted these meetings and eventually did not meet with Defendants because of another surgery she underwent on November 24, 2015. (*Id.* at 198-201; *see also id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 39.)

Following the surgery on November 24, 2015, Plaintiff did not endeavor to return to work until April 2016. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 204-05.) Plaintiff simply presents no evidence that Defendants refused to let her return to work during September 2015 or thereafter. Rather, the record reflects, without any genuine dispute, that Defendants were actively trying to accommodate Plaintiff but could not obtain the information they needed. Without any evidence of pretext to counter these legitimate, non-discriminatory reasons explaining the events that transpired from September 2015 through her termination, the Court grants summary judgment. *See Ennin*, 878 F.3d at 596; *Teruggi*, 709 F.3d at 660.

Plaintiff's claims also fail because she does not provide any evidence showing that in September 2015, she was "qualified to perform the essential functions of her job even with a reasonable accommodation." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). There is no dispute that Plaintiff's job required daily driving, getting in and out of her car, carrying promotional materials, climbing and descending stairs, and walking to and from physicians' offices. (16-cv-9964, R. 28, Answer to Am. Compl. at 3.) As of October 2015, Plaintiff could not fulfill these requirements given that her doctor stated that she could not "push, pull, or carry" anything, much less carry promotional materials as required by her job. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 153-54; *id.*, R. 41-2 at 46, Strnad Oct. 8, 2015, Note.)

Suggesting that Defendants' conduct in September 2015 was pretext for discrimination, Plaintiff also submits that she had returned to work in 2011 with similar physical restrictions. (*See* 16-cv-9964, R. 40, Pl.'s SOAMF ¶¶ 15, 19.) This claim, however, is not supported by the record. In 2011, Plaintiff's restrictions were as follows: working no more than 8 hours a day; no sitting, standing, or walking for more than four hours at a time; no lifting in excess of ten pounds with her right arm; and avoiding any pushing and pulling with her right arm. (*Id.*, R. 41-2 at 27, Regan Dec. 22, 2011, Email.) These directives were far less restrictive than the ones Dr. Strnad proposed in 2015, and given the many additional surgeries Plaintiff had undergone since 2011, Defendants were under no obligation to blindly institute the same accommodations they had instituted in 2011. *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 681 (7th Cir. 2010) ("An employer is not obligated to provide an employee the accommodation she requests or prefers, the employer need only provide some reasonable accommodation." (internal alteration omitted)).

Next, Plaintiff contends that Defendants knew she was able to perform her job by virtue of the video surveillance they conducted in September 2015. (16-cv-9964, R. 40, Pl.'s SOAMF ¶ 10.) Plaintiff cites to no evidence in her statements of fact, however, from which a reasonable jury could infer that this was the case. Specifically, Plaintiff cites no evidence showing that the Teva employees responsible for clearing her return to work saw the surveillance footage before September 2015, nor does she produce any evidence showing that the video surveillance had any connection to the human resources department's decisions affecting her. (*See id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 162; *id.*, R. 40-3, Bobrowski Feb. 28 Dep. Tr. at 44-45; *id.*, R. 41-1 at 64, Bobrowski Nov. 10, 2015, Email.) Additionally, there is no genuine dispute that the video surveillance occurred on or about September 9 and 10, 2015, and that after this time, Plaintiff

had submitted a doctor's note that required Defendants to meet with her to ascertain the accommodations she needed, whether or not she appeared fit in video surveillance. (*Id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 162; *id.*, R. 41-2 at 46, Strnad Oct. 8, 2015, Note; *id.*, R. 41-2 at 48, Sept. 10, 2015, Keen Email.) The video surveillance tape, therefore, does not create a triable issue of fact on her disability discrimination claims.[19] In sum, because Plaintiff's proffered facts are unsupported by the record and because she fails to create a genuine dispute of fact as to whether Defendants refused her return to work in September 2015, she cannot survive Defendants' motion for summary judgment.

### 15. Filming and Videotaping Plaintiff and Her Daughter

Plaintiff relatedly claims that Defendants' videotaping of her and her minor daughter constitute disability discrimination. (*Id.*, R. 26, Am. Compl. at 131.) Plaintiff presents no evidence that this is an "adverse job action" that would give rise to a disability discrimination claim. *See Lavalais*, 734 F.3d at 634; *Monroe*, 871 F.3d at 503. The Court, therefore, grants summary judgment on this claim.

### 16. Plaintiff's Termination

Plaintiff claims that Defendants terminated her because of her disability, (16-cv-9964, R. 26, Am. Compl. at 167-72), and argues that Defendants violated the ADA because that statute ostensibly "allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation." (*Id.*, R. 38, Mem. at 9 (emphasis omitted).) In response, Defendants argue that

---

[19] Contradicting her claim that Defendants refused to allow her to return to work, Plaintiff argues that she did in fact return to work on September 21, (*id.*, R. 40, Pl.'s SOAMF ¶¶ 11-13), but the evidence she cites does not support her claim. (*See id.*, R. 41-2 at 49, Keen Sept. 21, 2015, Email; *id.*, R. 41-2 at 50, Rothweiler Sept. 23, 2015, Email.) There is no dispute that she was preparing to return in September 2015 instead of actually returning. (*Id.*, R. 41-2 at 48, Sept. 10, 2015, Keen Email; *id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 142; 14-cv-9626, R. 86-6, Keen Oct. 15 Dep. Tr. at 103 ("A. Yeah, I have . . . not been back at work. I want to go back to work."); 16-cv-9964, 30-8 at 50, Keen Nov. 9, 2015, Email ("[W]ill this be my first day back?").)

Plaintiff was not a "qualified individual" under the ADA at the time of her termination. (*Id.*, R. 30-1, Mem. at 4-7.) The Court agrees with Defendants.

"The ADA is an antidiscrimination statute, not a medical-leave entitlement," and, as such, "[a]n employee who needs long-term medical leave cannot work and thus is not a 'qualified individual' under the ADA." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017). A "plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes." *Id.* Simply put, "the ADA does not protect individuals who fail to show up for work, even when their absences are a result of a disability." *Fogle v. Ispat Inland, Inc.*, 32 F. App'x 155, 157-58 (7th Cir. 2002). Nor does the ADA require "an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence." *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998); *see also Ortiz v. Bd. of Educ. of City of Chi.*, No. 11 C 9228, 2014 WL 3502640, at *3 (N.D. Ill. July 14, 2014) (plaintiff was not a "qualified individual" because he requested an indefinite leave of absence).

There is no evidence that following her surgery in November 2015, Plaintiff provided Defendants with any definite return date, and instead she was on an indefinite period of leave in which she periodically provided updates on her health.[20] Nor does Plaintiff produce any evidence showing that she was able to perform the essential functions of her job at the time of her termination. Accordingly, Plaintiff was not a "qualified individual" under the ADA at the time she was terminated, and the Court will grant summary judgment on her claim for disability discrimination connected to her termination. Even if Plaintiff was a "qualified individual," there is no evidence that Plaintiff was fired because of her disability as opposed to Defendants'

---

[20] On this point, Teva's policy provides that any request for an extended leave of absence beyond FMLA leave "must be for a specific duration and supported by appropriate documentation. Teva will not grant leaves or extended leaves of absence of an indefinite duration." (*Id.*, R. 46, Defs.' Resp. to Pl.'s SOAMF ¶ 37.)

application of their leave of absence and workers' compensation policies. (*See* 16-cv-9964, R. 46, Defs.' Resp. to Pl.'s SOAMF ¶ 37; *id.*, R. 41-3 at 41-42, Defs.' Resp. to Interrogs.)

Plaintiff's reliance on *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000), is misplaced. (*See* 16-cv-9964, R. 38, Mem. at 9.) Aside from being an out-of-Circuit case, in that case—unlike this one—the plaintiff requested a leave of absence for a defined period of time and with a specific return date. *Lederle*, 212 F.3d at 642 ("[The plaintiff] asked that her job be reserved until July 30th, when her doctors expected her to return to work, but to no avail. On June 13th, [the defendant] sent [the plaintiff] a letter . . . denying her request for additional leave."); *see also Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 132 (1st Cir. 2017) (distinguishing *Lederle* and noting that in *Lederle*, "the employee had demonstrated, in the circumstances of that case, that the requested accommodation of a few additional months of unsalaried leave, with the job functions being satisfactorily performed in the meantime, was reasonable" (citation, internal quotation marks, and internal alteration omitted)). Plaintiff also looks to *Rogers v. New York University*, 250 F. Supp. 2d 310 (S.D.N.Y. 2002) for support, (16-cv-9964, R. 38, Mem. at 9), but that case does not help her either. In *Rogers*, unlike this case, the plaintiff presented evidence that she could return to work on a definite date if she was offered reasonable accommodations. *Rogers*, 250 F. Supp. 2d at 315. Accordingly, the Court finds Plaintiff's arguments unavailing and grants summary judgment on her claims.

### B. Failure to Accommodate

Defendants also move for summary judgment on Plaintiff's failure to accommodate claims, (14-cv-9626, R. 81-1, Mem. at 6-7; 16-cv-9964, R. 30-1, Mem. at 7-10), which are that: (1) Defendants failed to accommodate her return to work in 2013, (*Id.*, R. 26, Am. Compl. at 6-7); and (2) Defendants failed to accommodate her with a modified sales territory in 2015, (*id.* at

111-17). These are the only claims in the operative complaint that can be reasonably understood as failure to accommodate claims. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852 (7th Cir. 2015) (ruling that the "mere invocation of ADA discrimination and the inclusion of the word 'accommodation' " in the complaint "did not provide [the defendant] with adequate notice" of a failure to accommodate claim). In light of the evidence submitted, these claims do not survive summary judgment.

For her failure to accommodate claims, Plaintiff must prove that (1) she is a "qualified individual" with a disability; (2) Defendants were aware of her disability; and (3) Defendants failed to reasonably accommodate her disability. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). "[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches[.]" *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013) (citation omitted). To prove that Defendants failed to reasonably accommodate her, Plaintiff must present "evidence showing not only her attempt to engage in an interactive communication process with" Defendants "to determine a reasonable accommodation, but also that" Defendants were "responsible for any breakdown that occurred in that process." *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 975-76 (7th Cir. 2009). "[A]n employee who fails to uphold her end of the bargain—for example, by not 'clarifying the extent of her medical restrictions'—cannot impose liability on the employer for its failure to provide a reasonable accommodation." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012).

Turning to her claim that Defendants refused to accommodate her return in 2013, (16-cv-9964, R. 26, Am. Compl. at 6-7), the Court concludes that summary judgment is proper on this claim. As noted above, there is no evidence that Defendants ever refused any of her requests for accommodations in 2013, as opposed to merely delaying their approval. Although Plaintiff

requested to return to work with reasonable accommodations in June 2013, there is no dispute that Plaintiff's doctor informed Defendants that Plaintiff was scheduled for another surgery that had not yet occurred, and that she was to refrain from work until the surgery. (14-cv-9626, R. 81-12 at 16, May 8, 2013, Shapiro Letter.) When Plaintiff requested that Defendants accommodate her return following the surgery, they ultimately granted her request and allowed her to return to work with weight-lifting restrictions on September 12, 2013. (*Id.*, R. 89, Defs.' Resp. to Pl.'s SOAMF ¶ 11.) Plaintiff complains that they did not allow her to return to work two weeks earlier, on August 29, 2013, (*e.g.*, 16-cv-9964, R. 26, Am. Compl. at 6), but an employer need only provide a reasonable accommodation, not the accommodation the employee prefers. *Hoppe*, 692 F.3d at 840. A plaintiff's "apparent displeasure with the way in which [her employer] decided on that accommodation, or with its failure to provide the exact accommodation [s]he would have preferred is irrelevant." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). Plaintiff's complaint here is not that Defendants' failed to accommodate her, but that she was displeased with Defendants' delay, which is insufficient. Accordingly, this claim cannot survive summary judgment. *See Morris v. Ford Motor Co.*, No. 15-CV-302-WMC, 2016 WL 4991772, at *7 (W.D. Wis. Sept. 16, 2016) (granting summary judgment on a failure to accommodate claim based on employer's delay, reasoning that "lengthier delays of a year or more not caused by a defendant's lack of good faith cannot in and of itself constitute a violation of the ADA.").

Plaintiff's remaining failure to accommodate claim is that Defendants failed to modify her sales territory. First, this claim fails because it hinges on Dr. Greaney's purported denial of the sales territory modification. (16-cv-9964, R. 26, Am. Compl. at 111-17.) Dr. Greaney

testified, however, that he did not deny Plaintiff's request for a reasonable accommodation. (14-cv-9626, R. 81-15, Greaney Aff. ¶ 6.) Plaintiff offers no evidence to dispute this testimony.

Even looking past Dr. Greaney and examining Defendants' conduct, Plaintiff's claim fails. There is no evidence from which a reasonable jury could find that Plaintiff attempted to engage in the requisite "interactive communication process" with Defendants or Dr. Greaney "to determine a reasonable accommodation," or that Defendants were "responsible for any breakdown that occurred in that process." *Ekstrand*, 583 F.3d at 975-76. Instead, she does not dispute that she was argumentative with Dr. Greaney, which prompted a breakdown in communication between Dr. Greaney and Plaintiff. (*See* 14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 59.) As a result, her failure to accommodate claim fails.

Plaintiff's claim also fails because there is no evidence that any of Plaintiff's doctors, as opposed to Plaintiff herself, communicated with anyone at Teva or Work Care regarding her accommodation of a modified sales territory. (*See id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 57; *id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 133-34, 136.) In such circumstances, summary judgment is proper. *See Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 921 (N.D. Ill. 2013) (granting summary judgment because the plaintiff failed to present her employers with a doctor's note stating that the specific accommodation she requested would improve her condition); *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493-94 (7th Cir. 2014) (affirming summary judgment because the plaintiff did not provide evidence showing how the requested accommodation would alleviate her disability).

Defendants accommodated Plaintiff throughout her tenure at Teva. In addition to the several leaves of absence that Defendants approved, Defendants gave Plaintiff an upgraded vehicle, a rolling bag, a change of territory in 2011-2012, and modified work hours so that

Plaintiff could visit her doctors and attend physical therapy. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 46-56.) Indeed, the undisputed evidence shows that Plaintiff returned to work in 2013 with medical restrictions, and did not go on leave again until 2015 because of an injury she sustained while lifting a box, not because she had to work with doctors in Indiana. (14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶ 61.) Before that 2015 injury, she was able to perform the essential functions of her job with the accommodations Defendants had provided. Thus, Plaintiff does not raise a genuine dispute of fact as to whether Defendants failed to reasonably accommodate her. *Hooper*, 804 F.3d at 852 (noting that "an employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job" and ruling that a defendant's failure to provide additional accommodations to reduce the employee's stress or improve her performance "cannot form the basis of a failure to accommodate claim"). The Court, therefore, grants summary judgment on Plaintiff's failure to accommodate claims.[21]

## II.  Gender Discrimination

To avoid summary judgment on her Title VII gender discrimination claims, Plaintiff "must present facts from which a reasonable juror could find that the [D]efendants terminated [her] because of [her] sex." *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004); *see also Ortiz*, 834 F.3d at 765 (holding that the "legal standard" in employment-discrimination cases is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action"). Plaintiff must offer evidence "demonstrating that (1) she is a

---

[21] The Court notes that there are instances in Plaintiff's summary judgment briefs where she appears to raise new failure to accommodate claims, but the Court declines to address them. *Glover v. Haferman*, 252 F. App'x 757, 761 (7th Cir. 2007) (ruling that "the district court did not err when it refrained from addressing the [plaintiff's] claim at summary judgment" because the claim was "not in the complaint").

member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Mercer v. Cook Cty., Ill.*, 527 F. App'x 515, 522 (7th Cir. 2013) (citation omitted). Plaintiff's claims for sex discrimination under the IHRA are analyzed under the same framework as her Title VII discrimination claims. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) ("Illinois courts apply the federal Title VII framework to IHRA claims."); *Owens v. Dep't of Human Rights*, 936 N.E.2d 623, 639 (Ill. App. 2010) (observing that Title VII and IHRA claims are analyzed under the same standard).

Plaintiff asserts gender discrimination claims based on: (1) Defendants' failure to promote her to SESS; (2) Defendants' refusal to pay Plaintiff her full 2013 bonus and their decision to list her as ineligible for the "Make it Happen" sales contest; (3) Defendants' denial of Plaintiff's request for excess insurance coverage; (4) Defendants' refusal to modify her sales territory and her poor 2014 performance review; and (5) Defendants' conduct in 2015 and 2016 relating to her leave, termination, and denial of disability benefits. (16-cv-9964, R. 26, Am. Compl. at 54-57, 62-65, 92-100, 108-10, 118-20, 137-39, 162-66.)

Turning first to the SESS position, Plaintiff offers no evidence that Defendants denied her the position because of her gender. (*See* 14-cv-9626, R. 86-5, Keen Oct. 14 Dep. Tr. at 114.) The only evidence she provides is the fact that several men were promoted to the position despite not meeting all of the qualifications. (*Id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶¶ 33, 34.) There is no evidence, however, showing that those men were similarly situated to Plaintiff—i.e., that their superiors did not consider them leaders, mentors, or role models. *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016) (observing that plaintiff must show *"sufficiently analogous"* conduct

that led to her adverse treatment "to support an inference that she was treated more harshly because of her sex" (emphasis in original)), *cert. denied*, 137 S. Ct. 398 (2016).

Plaintiff argues that Defendants' decision is suspicious because she met all of the objective criteria and was recommended for the SESS position, but there is no dispute that being a leader, mentor, and role model was also a requirement. (14-cv-9626, R. 89, Defs.' Resp. to Pl.'s SOAMF ¶ 13.) Plaintiff puts forward no evidence showing that this legitimate and non-discriminatory reason for denying her the SESS position was a lie or pretext for discrimination. *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (granting summary judgment where the plaintiff could not show that the defendants' legitimate proffered reason for an adverse employment action was pretext for discrimination).

Plaintiff argues nevertheless that Defendants' reasons for not promoting her to SESS were pretextual because Defendants lacked the authority to reject qualified candidates. (14-cv-9626, R. 87, Mem. at 19.) There is no dispute, however, that Plaintiff was unqualified because one of the requirements was to be considered a role model, mentor, and leader. Plaintiff fails to present evidence of pretext or any other evidence from which a reasonable jury could conclude that Defendants denied Plaintiff the SESS position because of her gender. *See Ortiz*, 834 F.3d at 765. Consequently, the Court grants summary judgment on this claim.

Next, Plaintiff claims that Defendants discriminated against her by not paying her full 2013 bonus and humiliating her during the "Make it Happen" sales contest. That Plaintiff was embarrassed because she was listed as ineligible for the sales contest is not an adverse employment action that would give rise to a discrimination claim. *See Jones*, 613 F.3d at 671; *Krause*, 246 F.3d at 1000. Plaintiff simply presents no evidence that she received a lower bonus in 2013 because of her gender. Instead, Plaintiff claims that the reduced bonus was a result of her

disability, not her gender. (14-cv-9626, R. 86-2, Pl.'s SOAMF ¶ 30.) The Court, therefore, grants summary judgment on these claims.

Turning to Defendants' denial of Plaintiff's request for excess insurance coverage, Plaintiff cannot survive summary judgment because denial of excess insurance—a benefit to which she was not automatically entitled—is not an adverse job action giving rise to a discrimination claim. *Hottenroth*, 388 F.3d at 1033. As for her gender discrimination claims based on her 2014 performance review and her request for a modified sales territory, Plaintiff simply presents no evidence connecting Defendants' conduct to her gender. She also fails to produce evidence showing that similarly situated males were treated differently with respect to such requests and performance reviews. Accordingly, the Court grants summary judgment on this claim as well. *See Mercer*, 527 F. App'x at 522.

With respect to Plaintiff's gender discrimination claims based on her termination, leave, and denial of disability benefits in 2015-2016, Plaintiff argues that she was treated more harshly than two male employees, Sean Cleveland and David Musgrave. (16-cv-9964, R. 38, Mem. at 7-8, 11-12.) The Court again finds that Plaintiff's claims are not supported by the record, and therefore summary judgment is appropriate on her gender discrimination claims.

"Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation and internal quotation marks omitted). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation and internal quotation marks omitted). To survive summary judgment,

Plaintiff must show "*sufficiently analogous*" conduct that led to her adverse treatment "to support an inference that she was treated more harshly because of her sex." *Kuttner*, 819 F.3d at 976. Plaintiff submits no evidence showing that she was terminated for the same reasons as Cleveland and Musgrave, or that "there were no differentiating or mitigating circumstances that would distinguish" Defendants' treatment of Plaintiff as compared to their treatment of Cleveland and Musgrave. *Johnson v. Chi. Transit Auth.*, 699 F. App'x 558, 559 (7th Cir. 2017), *reh'g denied* (Nov. 20, 2017). In addition, like Plaintiff, Cleveland and Musgrave were eventually terminated, (16-cv-9964, R. 40-3, Bobrowski Feb. 28 Dep. Tr. at 59-62), and she fails to present any evidence of similarly-situated employees of the opposite gender who were *not* terminated. *See Johnson*, 699 F. App'x at 559. Accordingly, Defendants' conduct towards Cleveland and Musgrave is not evidence giving rise to an inference of discrimination.

Plaintiff claims that her male comparators were treated differently in that, unlike her, "Cleveland was able to keep his car[.]" (*Id.*, R. 40, Pl.'s SOAMF ¶ 35 (emphasis omitted)). The evidence Plaintiff cites to, however, indicates that Cleveland was allowed to keep his company car because, unlike Plaintiff, he was designated as being on short-term disability leave. (*Id.*, R. 41-2 at 33-36, Field July 28, 2016, Email; *compare id.*, R. 41-2 at 20, H.R. Mgmt. Guideline, *with id.*, R. 41-2 at 44, Bobrowski Aug. 3, 2015, Letter.) Thus, Cleveland was not similarly situated to Plaintiff.

Plaintiff also argues that Cleveland was given more leave than she was, and that he was given health and dental insurance while on leave. (*Id.*, R. 40, Pl.'s SOAMF ¶ 35.) Cleveland, however, endeavored to provide Defendants with a definite return date, whereas Plaintiff did not. (*Compare id.*, 41-3 at 18, Duff Jan. 17, 2017, Email, *with id.*, R. 41-2 at 67-68, Strnad April 15, 2016, Note, *and id.*, R. 41-2 at 19, H.R. Mgmt. Guideline.) Cleveland was also on a disability

leave, unlike Plaintiff. (*See id.*, 41-3 at 15, Field July 28, 2016, Email.) Again, Plaintiff simply presents no evidence that Cleveland was similarly situated to her.

Musgrave, like Cleveland, was not similarly situated to Plaintiff. It is undisputed that Musgrave was also on a disability leave. (*Id.*, R. 41-3 at 24, Vest July 10, 2013, Email.) Additionally, as further evidence that Plaintiff was treated the same as other employees, Musgrave, like Plaintiff, had his company car taken away when his status changed from short-term to long-term disability leave. (*See id.*, R. 41-3 at 27-28, Vest Feb. 17, 2015, Email.)

Plaintiff also presents no evidence that Cleveland or Musgrave filed a workers' compensation claim like she did. (*See id.*, R. 40-2, Keen March 29-30 Dep. Tr. at 115.) There is no genuine dispute that Teva's workers' compensation policy provides that Defendants may terminate an employee whose leave is connected to a workers' compensation claim and has not worked for a year or longer. (*See id.*, R. 41-3 at 41-42, Defs.' Resp. to Interrogs.) Plaintiff herself was aware of this policy. (*Id.*, R. 41-2 at 34, Keen July 9, 2015, Email.) Plaintiff, therefore, is not similarly situated because the events leading to her termination are distinguishable from the circumstances affecting Cleveland and Musgrave. *See Coleman*, 667 F.3d at 846; *see also Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (summary judgment was proper where plaintiff violated company's overtime policy but plaintiff provided no evidence that the comparison employees violated the same policy). The Court, therefore, grants summary judgment against Plaintiff on her gender discrimination claims.

## III. Retaliation

Defendants argue that the Court should grant summary judgment on Plaintiff's retaliation claims because she has not identified any causal link between any protected activity she engaged in and an adverse employment action. (16-cv-9964, R. 30-1, Mem. at 11-13; *id.*, R. 81, Mot. for

Summ. J. at 2.) To succeed on a claim for retaliation, whether related to alleged disability or gender discrimination, "a plaintiff must demonstrate that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018); *see also Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007) (enumerating same elements to establish retaliation in Title VII case).

The causation standard is generally the same for ADA and Title VII retaliation claims. *See Johnson v. City of Chi. Bd. of Educ.*, 142 F. Supp. 3d 675, 693 (N.D. Ill. 2015). Under the ADA, Plaintiff "must show her protected activity was a 'substantial or motivating factor' behind the adverse employment action." *Taylor-Novotny*, 772 F.3d at 495. Plaintiff can make this showing through a direct admission of a retaliatory motive or a "convincing mosaic" of circumstantial evidence that gives rise to an inference of a "retaliatory animus." *Id.* "Title VII retaliation claims must be proved according to traditional principles of but-for causation" which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Speculation is insufficient, and instead, Plaintiff "must produce facts which somehow tie [an] adverse decision to [her] protected action." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).

The retaliatory acts Plaintiff complains of are: (1) Defendants' directive that Plaintiff return to work in June 2013 and their subsequent refusals to permit her return to work; (2) Defendants' failure to promote Plaintiff to SESS; (3) Defendants' alleged failure to pay Plaintiff her full 2013 bonus and alleged humiliation of Plaintiff in connection with the "Make it Happen" sales contest; (4) Defendants' failure to offer her excess insurance; (5) Defendants' alleged

refusal to allow Plaintiff to attend a career workshop; (6) Plaintiff's poor 2014 performance review and Defendants' denial of Plaintiff's request to modify her sales territory; (7) Defendants' alleged dissemination of false information to Scott Insurance; (8) Defendants' alleged refusal to provide Plaintiff with a medical case manager; (9) Defendants' failure to pay Plaintiff workers' compensation or disability benefits after April 2015; (10) Defendants' retrieval of Plaintiff's company car and decision to transfer her to a COBRA health insurance plan; (11) Defendants' video surveillance of Plaintiff; (12) Defendants' alleged refusal to allow Plaintiff to return to work in 2015; and (13) Defendants' termination of Plaintiff. (16-cv-9964, R. 26, Am. Compl. at 21-44, 66-80, 102-123, 140-43, 146-49, 156-61.)

By filing complaints with the EEOC and IDHR, (*id.*, R. 28, Answer to Am. Compl at 7-8, 24, 56-57, 72, 83), Plaintiff no doubt engaged in protected activity. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015). Plaintiff, however, must also present evidence of a causal connection between her protected activity and an adverse employment action. *Rodrigo*, 879 F.3d at 243; *Kodl*, 490 F.3d at 562. Because she provides neither direct evidence nor a "convincing mosaic of circumstantial evidence" of a causal connection, the Court grants summary judgment on all of her retaliation claims. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) (describing the types of evidence that may support a reasonable inference of retaliation).

Plaintiff offers no evidence showing a causal link between her abortive attempts to return to work in 2013 and any other protected activity. (*See* 14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶¶ 19-26; *id.*, R. 86-2, Pl.'s SOAMF ¶¶ 8-11.) The same is true for her retaliation claim related to denial of the SESS position, which she claims was the result of gender or disability

discrimination, not any protected activity. (*See id.*, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶¶ 28-34; *id.*, R. 86-2, Pl.'s SOAMF ¶¶ 12-26.)

Plaintiff's retaliation claims based on Defendants listing her as ineligible for the "Make it Happen" sales contest and their alleged failure to pay her full 2013 bonus fare no better. For her retaliation claims, Plaintiff must prove that she suffered an adverse employment action. *See Rodrigo*, 879 F.3d at 243. Defendants' decision to list Plaintiff as ineligible for the sales contest had no tangible consequence on her job, and therefore is not an adverse employment action. *See Jones*, 613 F.3d at 671; *Krause*, 246 F.3d at 1000. For her claim related to her 2013 bonus, there is no evidence that her reduced bonus was in any way connected to protected activity. (*See* 14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶¶ 38-42; *id.*, R. 86-2, Pl.'s SOAMF ¶¶ 29-31.)

Plaintiff's retaliation claim based on Defendants' failure to provide her excess insurance coverage, a benefit to which she was not automatically entitled, cannot survive summary judgment because denial of such a benefit is not an adverse employment action. *See Hottenroth*, 388 F.3d at 1033. Her claim related to Defendants' refusal to allow her to attend a career workshop also fails because she provides no evidence that this act was somehow related to the filing of a discrimination complaint—instead she claims that she was denied the opportunity to attend the career workshop because of her gender or disability. (*See* 14-cv-9626, R. 86-1, Pl.'s Resp. to Defs.' SOMF ¶¶ 66-69; *id.*, R. 86-2, Pl.'s SOAMF ¶¶ 39.)

With respect to her 2014 performance review, Plaintiff was asked to explain how it was retaliatory, and she could provide no facts tying any protected activity to her poor performance review. Instead, she merely disagreed with the 2014 performance review's assessment and expressed an "opinion" that Defendants retaliated against her. (*Id.*, R. 86-6, Keen Oct. 15 Dep. Tr. at 141, 143-44, 147-148, 152-54, 158-59.) Because she provides no evidence causally tying

any protected activity to her 2014 performance review, summary judgment is appropriate against this claim as well.

With respect to Defendants' alleged dissemination of false information to Scott Insurance, Plaintiff cites to no evidence showing that any information provided to Scott Insurance was in retaliation or related to any protected activity. Plaintiff was questioned directly as to how any retaliation occurred related to these allegations, but she could provide no explanation or point to any evidence showing how any information provided to Scott Insurance was retaliatory. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 95-98.) She also cites no other evidence giving rise to an inference of retaliation for this claim.

Plaintiff, likewise, offers no evidence causally linking any protected activity to Defendants' failure to provide her with a medical case manager, (*id.* at 99-112), Defendants' failure to pay her workers' compensation and disability benefits, (*id.* at 114-16, 125-28, 135),[22] Defendants' retrieval of her company car and placing her on a COBRA health insurance plan, (*id.* at 165-71, 323-26), or Defendants' video surveillance of her or her daughter, (*id.* at 217-19). With respect to Defendants' alleged refusal to allow Plaintiff to return to work in 2015, Plaintiff fails to provide any evidence showing that Defendants' conduct in 2015 was tied to any protected activity. As for her termination, there is no evidence that Plaintiff's termination was causally connected to the filing of any discrimination complaint, and her statements of fact do

---

[22] Plaintiff testified that Teva's human resources department was aware of her protected activity and made decisions that affected her negatively. (16-cv-9964, R. 40-2, Keen March 29-30 Dep. Tr. at 126-28.) Reciting two events isolated from each other without any evidence of a causal link, however, is insufficient to survive summary judgment. *See Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 866 (7th Cir. 2011) (affirming summary judgment because plaintiff failed "to show that [her employer] took any adverse action against her *because* of her complaint" (emphasis in original)).

not even claim that there was such a causal connection.[23] (*Id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶¶ 46-48, 54-47; *id.*, R. 40, Pl.'s SOAMF ¶¶ 25-39.) Plaintiff simply fails to cite any evidence that would create a triable issue on her retaliation claims, and summary judgment is proper.

This case is simply unlike those that have survived summary judgment. *See Parker v. Ill. Human Rights Comm'n*, No. 12-CV-8275, 2016 WL 946655, at *9 (N.D. Ill. Mar. 14, 2016) (denying summary judgment where the plaintiff offered evidence of suspicious timing and the employer's sudden dissatisfaction with the plaintiff despite her near-perfect performance reviews); *Carwyle v. Anna Hosp. Corp.*, 102 F. Supp. 3d 1024, 1033 (S.D. Ill. 2015) (denying summary judgment where the plaintiff produced evidence of suspicious timing coupled with evidence showing that she suddenly lost extra overtime work at a job where such work was continuously available). Unlike such cases, Plaintiff fails to provide evidence of any suspicious timing coupled with erratic behavior on the part of Defendants. The evidence Plaintiff relies on is far too speculative to create any triable issue.

Plaintiff argues that her retaliation claims survive summary judgment because a number of the adverse actions she complains of happened after she filed discrimination complaints. (16-cv-9964, R. 38, Mem. at 15.) Plaintiff, however, does not point to any evidence that Defendants timing was suspicious, just that actions happened at some time after she engaged in protected activity. This is insufficient. *See Sauzek*, 202 F.3d at 918. Plaintiff also argues that Defendants' stated rationale for her termination—the workers' compensation policy—was pretext for a retaliatory motive because Defendants had originally extended Plaintiff's leave of absence until September 2015 pursuant to the ADA. (16-cv-9964, R. 38, Mem. at 8.) Plaintiff, however, fails

---

[23] Plaintiff only claims that her termination was in retaliation for filing of workers' compensation claims—not discrimination claims—which is the subject of her state-law retaliatory discharge claim. (16-cv-9964, R. 40, Pl.'s SOAMF ¶ 32.) As discussed in further detail below, there is no evidence from which a reasonable jury could conclude that Plaintiff was terminated in retaliation for filing a claim with the IWCC.

to provide any evidence showing that these two decisions are at odds with each other. One decision involves extension of leave pursuant to Teva's leave policy and the ADA, and the other involves Plaintiff's termination pursuant to Teva's workers' compensation policy.

Also undermining Plaintiff's argument is that she fails to present any evidence showing that she was on an ADA-protected leave when she was terminated. (*See id.*, R. 30-9 at 42, Bobrowski Aug. 3, 2015, Letter; *see also id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 18.) Plaintiff offers no evidence that Defendants had approved further leave for her under the ADA after September 18, 2015, (*id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶¶ 17-18, 22, 27-48, 55; *id.*, R. 40, Pl.'s SOAMF ¶¶ 6, 12-34[24]). Nor is there any indication that Plaintiff was protected by the ADA since she failed to provide Defendants with any definite timetable for her return. *See Nowak*, 142 F.3d at 1004. Defendants' different decisions based on different company policies simply do not permit a reasonable inference that their decisions were incongruous or that their proffered reason for termination was pretextual. *See Argyropoulos*, 539 F.3d at 736. Accordingly, the Court grants summary judgment against Plaintiff on her retaliation claims.

## IV.    Retaliatory Discharge

Plaintiff also claims that Defendants terminated her in retaliation for filing workers' compensation claims with the IWCC. (16-cv-9964, R. 26, Am. Compl. at 150-52.) "In Illinois . . . it is unlawful to terminate an employee in retaliation for exercising her rights under the [Illinois Workers' Compensation Act]." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012). "A valid claim for retaliatory discharge requires a showing that (1) an employee has

---

[24] Plaintiff cites to a Rothweiler email as evidence she was on an ADA leave when she was terminated. (*Id.*, R. 39, Pl.'s Resp. to Defs.' SOMF ¶ 44.) That email, however, does not support her claim. (*See id.*, R. 41-2 at 50, Rothweiler Sept. 23, 2015, Email.) None of the other evidence she cites to shows that Defendants extended her ADA leave past September 2015. Plaintiff cites to Defendants' termination letter as evidence she was on an ADA leave at the time of her termination, but this letter provides no indication that Defendants extended her earlier ADA leave that expired on September 18, 2015. (*See id.*, R. 30-8 at 58, April 21, 2016, Termination Letter.)

been discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy." *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000). Plaintiff must also provide evidence of a causal link between her termination and the filing of her workers' compensation claim with the IWCC. *Bourbon*, 223 F.3d at 472-73 (affirming summary judgment because plaintiff had "insufficient evidence demonstrating a link between reporting his supervisor's conduct and his termination"). Additionally, the element of causation is not met if Defendants had a valid basis for terminating Plaintiff that was not pretextual. *Jackson v. United Parcel Serv., Inc.*, 337 F. App'x 569, 571 (7th Cir. 2009). Defendants argue that the Court should grant summary judgment on this claim because there is no evidence of a causal relationship between her termination and the filing of her workers' compensation claims with the IWCC. (16-cv-9964, R. 30-1, Mem. at 14-15.)

Here too, Plaintiff fails to come forward with any evidence of a causal link. Plaintiff's termination was far removed from her filing of claims with the IWCC, occurring approximately a year after her last IWCC filing. (*See id.*, R. 41-2 at 84-86, Workers' Comp. Claims.) Additionally, as noted above, Defendants terminated Plaintiff in accordance with Teva's workers' compensation and leave policies, and Plaintiff offers no evidence of pretext.[25] (*Id.*, R. 40-3, Bobrowski Feb. 28 Dep. Tr. at 98-99, 112-13.) The Court, therefore, grants summary judgment against Plaintiff on her retaliatory discharge claim. *See Gordon*, 674 F.3d at 773; *Jackson*, 337 F. App'x at 571.

## V. IWA Claims

Based on the same conduct alleged for all of the claims above, Plaintiff claims that Defendants violated the IWA by retaliating against her for filing complaints with the EEOC,

---

[25] There is no evidence that Teva's policy itself is tied to any protected activity as opposed to an employee's inability to return to work after a workplace injury. (*Id.*, R. 40-3, Bobrowski Feb. 28 Dep. Tr. at 98-99, 112-13.)

IDHR, and IWCC. (16-cv-9964, R. 26, Am. Compl. at 45-53, 81-84, 143-45, 153-55.) To survive summary judgment, Plaintiff must come forward with some evidence that Defendants' actions were taken with retaliatory motive in response to her filing of complaints with the EEOC, IDHR, or IWCC. *Williams v. Office of Chief Judge of Cook Cty. Ill.*, 839 F.3d 617, 627 (7th Cir. 2016); *see also Pratt v. McAnarney*, No. 08-3144, 2010 WL 2594745, at *7 (C.D. Ill. June 25, 2010) (granting summary judgment because "[the defendant] terminated [the plaintiff] because [the plaintiff] abandoned her position, not because" she reported a violation of state or federal law to a government agency). Because the Court has already determined that Plaintiff presents no evidence of retaliation with respect to Plaintiffs' ADA, Title VII, retaliatory discharge, and IHRA claims above, Defendants' claims under the IWA also fail. *See Grady v. FCA US LLC*, No. 15 C 50012, 2017 WL 5896894, at *9 (N.D. Ill. Mar. 30, 2017) (granting summary judgment on IWA claims because plaintiff failed to prove as to federal retaliation claims that an adverse job action was motivated by the employee's protected activity); *Schlicksup v. Caterpillar, Inc.*, No. 09-CV-1208, 2010 WL 2774480, at *7 (C.D. Ill. July 13, 2010) (observing that "[t]he parallels between" the definition of retaliation in the IWA and the standard for Title VII retaliation "suggest that Whistleblower retaliation is defined in a similar way to Title VII retaliation," and therefore the plaintiff's "claims stand and fall on the same merits"). Accordingly, the Court grants Defendants' summary judgment on Plaintiff's IWA claims.

## VI. Plaintiff's Motion to Strike and for Sanctions

Finally, Plaintiff argues that the Court should strike Defendants' reply. (16-cv-9964, R. 47, Mot. to Strike.) Because the Court has not relied on Defendants' reply brief in its decision, the motion to strike is denied as moot. In addition, the Court disagrees with Plaintiff that Defendants' reply brief is "dishonest" or "warrants severe sanctions." Plaintiff relies on *National*

*Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 64-43 (1976), for her argument

that sanctions are appropriate, but that case involved failure to abide by a court order. This case

does not. Plaintiff's request for sanctions, therefore, is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (14-cv-9626,

R. 81; 16-cv-9964, R. 30) are GRANTED, and Plaintiff's motion to strike and for sanctions (16-

cv-9964, R. 47) is DENIED. The question before the Court is not whether Defendants treated

Plaintiff in a fair manner in view of her contribution to Defendants' bottom line. The question is

whether Plaintiff has presented any material issues of fact or law that require a potential jury trial

in light of the undisputed facts. The Court has answered this question with a negative answer.

Therefore, judgment is ENTERED in favor of Defendants and against Plaintiff on all counts in

her first amended complaint, (16-cv-9964, R. 26).

ENTERED: 

Chief Judge Rubén Castillo
United States District Court

**Dated: March 20, 2018**